## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | CIVIL ACTION NO. _____ |
| THE STATE OF COLORADO, | ) | |
| EX REL. KIMBERLY BEGANO | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| CENTURA HEALTH CORPORATION; | ) | **FILED IN CAMERA AND** |
| PEDIATRIC PULMONARY AND | ) | **UNDER SEAL** |
| SLEEP SPECIALISTS P.L.L.C., D/B/A | ) | |
| PEDIATRIC SLEEP SPECIALISTS, | ) | |
| ALAIN EID, M.D., | ) | |
| CHRISTOPHER PEKURNY, RRT, | ) | |
| and VIRAL KOTHARI, M.D. | ) | |
| | ) | **DO NOT PLACE ON PACER** |
| | ) | |
| Defendants. | ) | JURY TRIAL DEMANDED |

**COMPLAINT FOR DAMAGES AND OTHER RELIEF
UNDER THE QUI TAM PROVISIONS OF THE
FEDERAL FALSE CLAIMS ACT [31 U.S.C. § 3729 *et seq.*]
AND THE COLORADO MEDICAID FALSE CLAIMS ACT
[Colo. Rev. Stat. § 25.4-4-303.4 *et seq.*]**

On behalf of the United States of America and the State of Colorado, plaintiff-relator Kimberly Begano ("Relator") brings this action against Centura Health Corporation, Pediatric Pulmonary and Sleep Specialists, P.L.L.C d/b/a Pediatric Sleep Specialists, Alain Eid, M.D.., Christopher Pekurny, R.R.T., and Viral Kothari, M.D., for violations of the Federal False Claims Act, 31 U.S.C. § 3729 *et seq.* and the Colorado Medicaid False Claims Act, Colo. Rev. Stat. § 25.4-4-303.4 *et seq.*

## I.     INTRODUCTION

1.      This is an action to recover damages and civil penalties on behalf of the United States of America and the State of Colorado arising from false and/or fraudulent statements,

records, and claims made or caused to be made by defendants Centura Health Corporation ("Centura"), Pediatric Pulmonary and Sleep Specialists P.L.L.C. d/b/a Pediatric Sleep Specialists ("Pediatric Sleep Specialists"), Dr. Alain Eid ("Dr. Eid"), Christopher Pekurny, RRT ("Mr. Pekurny"), and Dr. Viral Kothari ("Dr. Kothari") (collectively, "Defendants") in violation of the Federal False Claims Act, 31 U.S.C. §3729 *et seq.,* and the Colorado Medicaid False Claims Act, Colo. Rev. Stat. **§** 25.4-4-303.4 *et seq.*

A.    Brief Background on Polysomnographic and CPAP Testing

2.     This case involves unlawful billing practices related to the operation of sleep laboratories. At sleep laboratories, patients receive polysomnographic diagnostic sleep tests ("PSG tests") to diagnose sleep disorders. PSG tests typically involve a patient staying overnight at a sleep laboratory, where they are hooked up to a number of electrodes used to monitor their heart rate, brain activity, breathing, and body movement during sleep.

3.     The results of the PSG test are called a polysomnogram. The polysomnogram receives a numerical score based on the number of certain defined respiratory events (cessations of breathing) experienced by a patient per hour. This score can be used to diagnose a patient with obstructive sleep apnea ("OSA"), one of the most common sleep disorders.

4.     When an adult patient is diagnosed with OSA, a doctor may prescribe a second overnight sleep test using a CPAP (continuous positive airway pressure) machine, a medical device that is worn on the patient's face and clears breathing obstructions. If the patient responds positively to the CPAP test (referred to as a "titration"), they may be prescribed a CPAP device to wear at home on a nightly basis.

5.     While PSG and CPAP tests must be physician-prescribed, they are typically performed by non-physician sleep technologists, who are subject to a number of federal and state regulations, including credentialing requirements.

6.      In Colorado, a sleep technologist must be certified by a nationally recognized accreditation authority in order for their services to be billed to Medicare or TRICARE. Similarly, for a sleep technologist's services to be billed to Colorado Medicaid, the sleep technologist must either be certified by an accreditation authority, or practice under the direct supervision of a physician, credential pulmonary technologist, or credentialed sleep technologist.

**B.      Brief Background on the Parties**

7.      Since 2019, Relator has been credentialed as a sleep technologist through the Board of Registered Polysomnographic Technologists (BRPT). She is also a Certified Nursing Assistant (CNA). She has worked at four different sleep laboratories, and is currently employed as a sleep technologist at UCHealth Memorial Hospital and a sleep coordinator at Sleep Well Southern Colorado. Prior to becoming a sleep technologist, she worked extensively in the medical field, including as a phlebotomist, an admissions attendant, and, from 2000 to 2011, the owner and operator of a medical transcription company. From January 2021 to April 2021, she worked as a sleep technologist at the Penrose-St. Francis Sleep Disorders Center ("Penrose-St. Francis Sleep Center"), a facility owned and operated by Defendant Centura.

8.      Centura is a hospital system that operates eight sleep laboratories throughout Colorado, including Penrose-St. Francis Sleep Center. Penrose-St. Francis Sleep Center is located in Colorado Springs, Colorado, on the campus of St. Francis Hospital, a hospital also owned and operated by Centura. It sees six patients a night, seven days a week. Defendant Dr. Eid is the Medical Director of Penrose-St. Francis Sleep Center. Defendant Mr. Pekurny is the Manager of Respiratory Services at St. Francis Hospital, and was Relator's direct supervisor while she worked at Penrose-St. Francis Sleep Center. In Relator's estimation, about eighty percent of patients seen at Penrose-St. Francis Sleep Center were insured by Medicare, Medicaid, or TRICARE.

9.      During the course of her employment, Relator observed and reported a number of illegal practices occurring at Penrose-St. Francis Sleep Center. The most common and systemic of these practices involved Centura allowing non-credentialed sleep technologists to conduct PSG and CPAP tests. This and other unlawful practices resulted, on information and belief, in the presentation of false claims to Medicare, Tricare, and Colorado Medicaid. Relator resigned from Centura when Mr. Pekurny informed her that participation and complicity in the organization's unlawful practices was a condition of continued employment.

10.     In addition to Penrose-St. Francis Sleep Center, Centura also operates several other sleep laboratories: Four Corners Sleep Disorders Center ("Four Corners"), located in Durango, Colorado; The Sleep Disorder Center at St. Thomas More Hospital ("St. Thomas More"), located in Canon City, Colorado; the Sleep Disorder Center at Castle Rock Adventist Hospital ("Castle Rock"), located in Castle Rock, Colorado; the Sleep Disorder Center at St. Anthony Summit Medical Center ("St. Anthony Summit"), located in Frisco, Colorado; the Sleep Disorder Center at St. Anthony Hospital ("St. Anthony Hospital"), located in Lakewood, Colorado; the Sleep Disorders Center at Parker ("Parker"), located in Parker, Colorado; and the Sleep Disorders Center at Porter ("Porter"), located in Denver, Colorado. Additionally, it formerly operated the now-defunct sleep laboratory at St. Mary-Corwin Medical Center ("St. Mary-Corwin"), located in Pueblo, Colorado. While Relator worked only at Penrose-St. Francis Sleep Center, based on her review of Centura job listings, she believes that at least one of the unlawful billing practices she observed, namely billings for the services of unsupervised, non-credentialed sleep technologists, occurred and continues to occur at all of Centura's sleep laboratories.

11.     Pediatric Sleep Specialists is a medical practice owned and operated by Dr. Kothari. On information and belief, he is the only physician employed by the practice. Pediatric Sleep

4

Specialist advertises itself as providing evaluation and treatment of sleep disorders to young children and teenagers throughout Colorado. However, Pediatric Sleep Specialists does not own or operate sleep laboratories. Rather, it rents space at several sleep laboratories across Colorado, including Penrose-St. Francis Sleep Center. On its website, Pediatric Sleep Specialists lists St. Francis Hospital—on whose campus Penrose-St. Francis Sleep Center is located—as an "affiliated hospital." Despite this claim of affiliation, Pediatric Sleep Specialists is not owned by Centura.

12.    While Dr. Kothari prescribes PSG and CPAP tests that are conducted at Penrose-St. Francis Sleep Center, neither he nor any employee of Pediatric Sleep Specialists performs these tests. Rather, Pediatric Sleep Specialists contracts with Centura for use of Penrose-St. Francis Sleep Center's sleep technologist staff. During her employment at Penrose-St. Francis Sleep Center, Relator became aware of several unlawful billing practices that, on information and belief, resulted, and continue to result, in the presentation by Pediatric Sleep Specialists of false claims to Medicare, TRICARE, and Medicaid, including failure to perform pre-test physical examinations, and the medically inappropriate prescribing of CPAP tests to young children. While these claims are for services provided *at* Penrose-St. Francis Sleep Center, they are not *presented* by Centura. Rather, Pediatric Sleep Specialists independently bills Medicare, TRICARE, and Medicaid for its sleep tests.

**C.**    **The False Claims**

13.    The false claims presented by Defendants Centura and Pediatric Sleep Specialists to Medicare, TRICARE, and Medicaid fall into six general categories:

a.    Claims made to Medicare and TRICARE by Centura and Pediatric Sleep Specialists for PSG and CPAP tests performed by sleep technologists who were not credentialed by an appropriate accreditation authority;

5

b.   Claims made to Medicare, TRICARE, and Medicaid by Centura for PSG and CPAP tests performed by sleep technologists without an adequate level of physician supervision, or which were scored by a sleep technologist instead of a physician;

c.   Claims made to Medicare, TRICARE, and Medicaid by Pediatric Sleep Specialists for medically unnecessary CPAP tests performed on children, despite the fact that relevant medical authorities consider pediatric CPAP tests to be inappropriate for most children;

d.   Claims made to Medicare, TRICARE, and Medicaid by Centura for CPAP tests that were not prescribed by a physician;

e.   Claims made to Medicare, TRICARE, and Medicaid by Pediatric Sleep Specialists for PSG and CPAP tests whose medical necessity had not been confirmed by a prior physical examination, or whose medical necessity had not been otherwise adequately documented; and

f.   Claims made to Medicare, TRICARE, and Medicaid by Pediatric Sleep Specialists for PSG and CPAP tests that were not performed by Pediatric Sleep Specialists' employees.

14.   These claims caused damages to federal and state health care programs.  As of 2021, the Medicare reimbursement rates for the initial PSG test and follow-up CPAP test are $652.16 and $680.87, respectively.  Considering, in Relator's estimation, that Penrose-St. Francis Sleep Center alone performs over two thousand sleep studies a year, the total amount overbilled to the federal and state health care programs is likely in the tens of million dollars.

1. **Centura and Pediatric Sleep Specialists falsely bill Medicare and TRICARE for PSG and CPAP tests performed by technologists who lacked the appropriate credentials.**

15.     The Local Coverage Determination (LCD) for Outpatient Sleep Studies (L35050) applies to claims for PSG and CPAP tests made to Medicare and TRICARE in Colorado. According to LC35050, PSG or CPAP tests must be attended by "an appropriately trained technologist." An "appropriately trained technologist" is defined as a technologist who has received an appropriate credential from a recognized accreditation authority, including the Board of Registered Polysomnographic Technologists, the National Board of Respiratory Care, and the American Board of Sleep Medicine.[1]

16.     While Relator was employed at Penrose-St. Francis Sleep Center, Centura employed multiple sleep technologists who were not credentialed by any recognized accreditation authority. Out of nine sleep technologists who administered PSG and CPAP tests, only four, Relator included, possessed the necessary credential. The five non-credentialed technologists routinely administered PSG and CPAP tests without supervision. Relator has in her possession schedules that show that shifts were frequently staffed with *no* credentialed technologists. Tests performed by these non-credentialed technologists were, on information and belief, unlawfully billed to Medicare and TRICARE.

17.     Centura routinely posts job listings for technologist positions on classified sites like linkedin.com and indeed.com. Since the termination of her employment, Relator has obtained multiple job listings for technologist positions at Centura's Four Corners, St. Thomas More, and Penrose-St. Francis Sleep Center sleep laboratories. Each of these job listings includes identical

---

[1] Local Coverage Determination L35050, effective 10/01/2015, revised 1/1/2021, available at https://www.cms.gov/medicare-coverage-database/details/lcd-details.aspx?lcdid=35050&ver=55&bc=CAAAAAAAAAAA

language describing an applicant's desired qualifications: "Registered Polysomnographic Technologist (RPSGT) Credential from the Board of Registered Polysomnographic Technologists (BRPT) upon hire **or within 2 years**" (emphasis added). The job listings also specify "The Polysomnographic Technologist **must be able to work independently**" (emphasis added). These job listings evidence a Centura-wide policy of hiring non-credentialed technologists and allowing them to perform PSG and CPAP tests without supervision for a period of two years.

18.     Further, during Relator's employment, she encountered non-credentialed technologists who had been working without credentials for significantly more than two years. These non-credentialed technologists had failed their licensure tests on multiple occasions. Mr. Pekurny, acting in his capacity as the Manager of Respiratory Services, assured these non-credentialed technologists that their employment was not in jeopardy.

19.     Dr. Kothari and Pediatric Sleep Specialists are aware of this Centura practice and nonetheless, on information and belief, continue to bill Medicare and TRICARE for services performed by non-credentialed technologists.

**2.       Centura falsely bills for Medicare, TRICARE, and Medicaid for tests performed under inadequate physician supervision, and for tests whose results were scored by non-physicians.**

20.     Under Medicare and TRICARE regulations, a sleep technologist, credentialed or otherwise, must work under the general supervision of a physician. 42 C.F.R. §410.32(b)(3). Under Colorado Medicaid rules, a non-credentialed technologist must work under the "Direct Supervision of an enrolled physician," or, alternatively, under the direct supervision of "certified pulmonary function technologists, registered pulmonary technologists, [or] registered polysomnographic technologists." 10 CCR 2505-8.200.2.D(1); CO Rev Stat §12-41.5-110(2)(a)(II) (2017); CO Rev Stat §12-41.5-110(2)(g) (2017).

21.     Additionally, under the Local Coverage Determination governing Medicare and TRICARE in Colorado, "[a]ll Sleep Studies...shall be interpreted by an appropriate physician with training in this area."

22.     Despite these requirements, neither Dr. Eid nor any other physician provided even adequate *general* supervision of Penrose-St. Francis Sleep Center's sleep technologists, much less direct supervision of the non-credentialed technologists. Indeed, in her time at Penrose-St. Francis Sleep Center, Relator never interacted with Dr. Eid directly or indirectly, and only became aware of his name and position the day she resigned from Centura. Further, credentialed sleep technologists like Relator did not have any supervisory authority over the non-credentialed technologists. Non-credentialed technologists worked entirely without legally required direct supervision. These practices resulted in, on information and belief, the presentation of false claims to Medicare, Medicaid, and TRICARE.

23.     Given the job listings discussed in section I.C.1, which make clear that Centura has a policy of hiring non-credentialed sleep technologists to perform PSG and CPAP tests ***independently***, on information and belief, Centura allows non-credentialed technologists to work without direct supervision in *all* of its sleep laboratories, resulting in additional false claims to Medicare, Medicaid, and TRICARE.

24.     In addition to Centura's failure to provide adequate physician supervision, Centura failed to provide physician interpretation of sleep studies, despite Medicare and TRICARE regulations mandating physician interpretation. PSG and CPAP tests were not interpreted and scored by Dr. Eid or any other physician. Rather, Athena Stroud, a sleep technologist who worked the dayshift at Penrose-St. Francis Sleep Center, was primarily responsible for interpreting and scoring sleep tests. In some instances, nightshift sleep technologists would also interpret these

results "on the fly." These practices are not permitted under Medicare and TRICARE rules, and on information and belief, resulted in the presentation of false claims to these insurers.

### 3. Pediatric Sleep Specialists falsely bills Medicare, TRICARE, and Medicaid for medically unnecessary CPAP tests performed on children.

25. The American Academy of Sleep Medicine and the American Academy of Otolaryngology-Head and Neck Surgery Foundation both recommend that CPAP testing not be used as a first-line treatment for children diagnosed with Obstructive Sleep Apnea. Rather, both organizations recommend tonsillectomy (removal of the tonsils) or adenotonsillectomy (removal of the adenoids and tonsils) as the appropriate first-line treatment. CPAP is an appropriate first-line treatment for children with OSA only if the child is obese or if they are for some other reason a poor candidate for surgical intervention.[2]

26. Medicare, TRICARE, and Colorado Medicaid will not pay for treatment that is not medically necessary. 42 U.S.C. § 1395y(a)(1)(A); 10 CCR 2505-10 8.000(8).

27. Rather than refer children diagnosed with OSA for tonsillectomy or adenotonsillectomy, Dr. Kothari and Pediatric Sleep Specialists routinely prescribe medically unnecessary CPAP tests to children as a first-line treatment, even though these children are not obese and are not otherwise poor candidates for surgery. These CPAP tests are performed at Penrose-St. Francis Sleep Center. These tests often result in profound discomfort for the children, without any corresponding medical benefit. Indeed, the only benefit of these tests—money, paid

[2] Ron B. Mitchell, MD *et al.*, *Clinical Practice Guideline: Tonsillectomy in Children (Update)*, 160 Otolaryngology-Head and Neck Surgery S1, S2, S20-S21 (2019), available at https://journals.sagepub.com/doi/pdf/10.1177/0194599818801757. ("Clinicians should recommend tonsillectomy for children with obstructive sleep apnea documented by overnight polysomnography"). The guidelines are publication of the American Academy of Otolaryngology-Head and Neck Surgery Foundation (AAO-HNSF). For purposes of these guidelines, "[o]besity is defined as body mass index (BMI ≥ 95th percentile." *Id.* at S17. AASM has endorsed these guidelines. Robin Lloyd, MD *et al*, *Letter to the Editor Regarding the Updated American Academy of Otalryngology-Head and Neck Surgery Foundation Clinical Practice Guideline on Tonsillectomy*, 15 Journal of Clinical Sleep *Medicine* 363, 363 (2019), available at https://jcsm.aasm.org/doi/pdf/10.5664/jcsm.7650.

by government insurers—accrues exclusively to the provider. On information and belief, Pediatric

Sleep Specialists has presented false claims for these medically unnecessary tests to Medicare,

TRICARE, and Medicaid.

> **4.** **Centura falsely bills Medicare, TRICARE, and Medicaid for CPAP tests that were not prescribed by a physician.**

28.     Under Medicare, TRICARE, and Colorado Medicaid rules, a "Split Night

Titration"—a procedure in which a patient receives a PSG test for the first half of the night, and

then, if the patient's PSG reaches a certain threshold AHI/RDI score, a CPAP test for the second

half of the night—may only be prescribed by a physician. L35050; *see generally* 10 CCR 2505-10

8.200 *et seq.* L35050: "The use of CPAP devices is covered under Medicare when ordered and

prescribed by the licensed treating physician to be used in adult patients with OSA.". *Id.*

29.     Despite the requirements that physicians specifically order split-night titration tests,

Penrose-St. Francis Sleep Center instructs its sleep technologists to convert PSG tests into split-

night titrations if a threshold AHI/RDI score is reached in the first several hours of a patient's test.

This results, on information and belief, in Centura presenting false claims to Medicare, TRICARE,

and Medicaid.

> **5.** **Pediatric Sleep Specialists falsely bills Medicare, TRICARE, and Medicaid for tests that were prescribed to children without a prior physical examination confirming their medical necessity, or which otherwise lacked adequate documentation of medical necessity.**

30.     Local Coverage Determination 3050 states, "[t]he patient is to be evaluated by a

physician prior to ordering of [sleep] test." According to the American Academy of Sleep

Medicine recommendations, a PSG test should be performed after a "thorough sleep history and a

physical examination that includes the respiratory, cardiovascular, and neurologic systems."[3]

---

[3] Vipesh K. Kapur, MD, MPH *et al.*, *Clinical Practice Guideline for Diagnostic Testing for Adult Obstructive Sleep Apnea: An American Academy of Sleep Medicine Clinical Practice Guidelines*, 13 Journal of Clinical Sleep

31.     However, Dr. Kothari frequently fails to perform a physical examination of pediatric patients before prescribing PSG tests. Indeed, Dr. Kothari frequently fails to even meet his pediatric patients in person before their test, instead issuing prescriptions via telemedicine.

32.     Pediatric Sleep Specialists also frequently fails to maintain the documentation of medical necessity required by Medicare, TRICARE, and Medicaid.

33.     Accordingly, these practices, on information and belief, have resulted in Pediatric Sleep Specialists presenting false claims to Medicare, TRICARE, and Medicaid.

### 6.     Pediatric Sleep Specialists falsely bills Medicare, TRICARE, and Medicaid for tests that were not performed by its employees.

34.     On CMS Form 1500, which must be submitted as part of any claim to Medicaid, a physician provider must certify "that the services listed above…were personally furnished by me or my employee under my personal direction." Likewise, for Medicare and TRICARE claims, a physician provider must certify, on the same form, that "the services on this form were…personally furnished by me or were furnished incident to my professional services by my employee under my direct supervision, except as otherwise expressly permitted by Medicare or TRICARE." CMS Form 1500.

35.     Pediatric Sleep Specialists, on information and belief, routinely falsely bills Medicare, TRICARE, and Medicaid for services provided by Centura employees at Penrose-St. Francis Sleep Laboratory, who do not operate under the supervision of Dr. Kothari or any other physician employed by Pediatric Sleep Specialists.

---

Medicine 479, 480 (2017), available at
https://www.ncbi.nlm.nih.gov/pmc/articles/PMC5337595/pdf/jcsm.13.3.479.pdf.

D.     **Retaliation against Relator.**

36.     Relator repeatedly reported, both verbally and in writing, several of these unlawful billing practices to her superiors, including her direct supervisor Mr. Pekurny, the Centura Human Resources department, and the Centura internal whistleblowing hotline.

37.     In particular, Relator repeatedly reported that non-credentialed technologists were unlawfully providing services to patients without supervision. Relator specifically reported an incident involving a CPAP mask being inappropriately applied to a young child by a non-credentialed technologist.

38.     Mr. Pekurny repeatedly dismissed Relator's concerns, and Centura Human Resources and the whistleblower hotline failed to meaningfully address Relator's reports.

39.     On April 8, 2021, Mr. Pekurny called Relator into a meeting in the administration building. He informed her that, if she wished to continue her employment with Centura, she would have to stop raising her concerns. He also demanded complicity and participation in the unlawful practices detailed herein. By making participation in the unlawful practices a condition of her continued employment, Mr. Pekurny constructively terminated Relator. Relator immediately resigned, as she was unwilling to participate in the unlawful practices. Mr. Pekurny informed Relator that, as a consequence of her resignation, a note would be placed in her personnel file preventing her from ever again being re-hired to work at a Centura hospital in any capacity.

40.     The unlawful practices described herein have, on information and belief, resulted in the United States of America and the State of Colorado paying out false claims made by Centura and Pediatric Sleep Specialists.

II.     **PARTIES**

    A.     **Plaintiffs**

    41.    The United States is a plaintiff to this action on behalf of the Department of Health and Human Services ("HHS"), the Centers for Medicare and Medicaid Services ("CMS"), and other federally funded health care programs including Medicare, Medicaid, TRICARE and the Veterans Administration.

    42.    Medicare is a government health insurance program for those 65 years or older, and those with certain disabilities. 42 U.S.C. §§ 426, 426A. Medicare is administered by CMS, which is part of HHS. CMS contracts with private contractors referred to as "fiscal intermediaries," "carriers," and "Medicare Administrative Contractors" ("MAC"), to act as agents in reviewing and paying claims submitted by healthcare providers. *See* 42 U.S.C. § 1395h; 42 C.F.R. §§ 421.3, 421.100. Upon information and belief, throughout the time period in which the unlawful billing described herein has occurred, the Medicare Part B MAC for Colorado has been Novitas Solutions, Inc.

    43.    In order to participate in the Medicare Program as a provider of medical or other health services, providers must submit an enrollment application to CMS. This application includes a certification that the provider will abide by all applicable Medicare laws, regulations, and program instructions, and that payment of a claim by Medicare is conditioned upon the claim and its underlying transaction complying with such laws, regulations, and program instructions. *See* Form CMS-855A, "Medicare Enrollment Application: Institutional Providers," p.47; Form CMS-855B, "Medicare Enrollment Application: Clinics/Group Practices and other Suppliers," p.30.

    44.    The Medicaid Program, 42 U.S.C. § 1396 *et seq.*, is a government health insurance program funded jointly by the federal and state governments. Each state administers its own

Medicaid program, but the state's programs are governed by federal statutes, regulations and guidelines.  The federal portion of states' Medicaid payments, the Federal Medical Assistance Percentage, is based on a state's per capita income compared to the national average.   During the relevant time period, the federal portion consisted of a minimum of 50% up to a maximum of roughly 80%.

45.     An entity that wishes to participate in Colorado Medicaid program (also known as "Health First Colorado") as a provider of medical or other health services must sign an agreement which includes a certification of compliance with "all federal and state civil and criminal statutes, regulations and rules relating to the delivery of benefits to eligible individuals and to the submissions of claims for such benefits." Colorado Department of Health Care Policy & Financing Provider Agreement, Form 010417a, p. 3. Additionally, the agreement specifies that the "provider shall request payment only for those services which are medically necessary or considered covered preventative services, and rendered personally by the Provider or rendered by qualified personnel under the Provider's direct and personal supervision. Provider shall submit claims only for those benefits provided by health care personnel who meet the professional qualifications established by the State." *Id.*

46.     TRICARE is a federally funded program that provides medical benefits to military personnel, their families, retired veterans, and reservists called to duty.  32 C.F.R. § 199 *et seq.*

47.     The Veterans Administration is a federally funded and administered program that provides medical benefits to military veterans and their dependents.

48.     Throughout the relevant time period, Defendants submitted false or fraudulent claims to Medicare, Medicaid, TRICARE and other federal and state health care programs for the fraudulent conduct alleged herein.

49.     The State of Colorado is a plaintiff in this action.  Throughout the relevant time periods specified herein, Defendants submitted false or fraudulent claims to the Colorado Medicaid program for the fraudulent conduct alleged herein.

50.     Relator Kimberly Begano is a citizen and resident of Colorado Springs, Colorado. She was employed as a polysomnography technologist at Penrose-St. Francis Sleep Center from January through April 2021. She became a Certified Polysomnographic Technologist (CPSGT) in March 2020, and a Registered Polysomnography Technologist (RPSGT) in September 2020; both of these positions are accredited through the Board of Registered Polysomnographic Technologists (BRPT). During her employment at Penrose-St. Francis Sleep Center, she was one of a minority of credentialed technologists employed to conduct sleep studies. She was scheduled for an average of three twelve-hour nightshifts a week. On a typical nightshift, she would be responsible for administering two sleep studies to two separate patients. Rather than be complicit in the ongoing fraud occurring at Penrose-St. Francis Sleep Center, she resigned her position in April 2021. The allegations in this complaint are based upon information Relator discovered through her work at Penrose-St. Francis Sleep Center and through her own personal efforts, observations and investigation.

51.     Begano has also been a Certified Nursing Assistant (CNA) since 2017. Prior to working at Centura, she had numerous jobs in the medical field. From 2010 to approximately 2011, she ran her own medical transcription company. Between 2011 and 2018, she worked emergency room admissions in a hospital in New Mexico. In 2018, she began working at Parkview Medical Center in Pueblo, Colorado, where she was trained first as a phlebotomist, and then as a sleep technologist, becoming a credentialed technologist in 2019. In 2019, she worked as a credentialed technologist at Delta Waves, a sleep laboratory in Colorado Springs, Colorado. The next year, she

worked on an as-needed basis in admissions at Mt. San Rafael Hospital in Trinidad, Colorado, and on a part-time basis as a sleep technologist at UCHealth Memorial Hospital in Colorado Springs, Colorado. She continued to work part-time at UCHealth Memorial Hospital while working at Penrose-St. Francis Sleep Center in 2021. Since the end of her employment at Penrose-St. Francis Sleep Center, she has worked at UCHealth Memorial Hospital full-time. She also works part-time as a sleep coordinator at Sleep Well Southern Colorado in Trinidad, Colorado.

**B.**     **Defendants**

52.     Defendant Centura Health Corporation ("Centura") is a non-profit corporation organized under the laws of the State of Colorado, headquartered at 9100 E. Mineral Circle, Centennial, Colorado 8011. Centura operates seventeen hospitals in Colorado and Western Kansas. It also operates eight sleep laboratories on the campuses of certain of these hospitals, all located in Colorado.

53.     Defendant Pediatric Pulmonary and Sleep Specialists, P.L.L.C. d/b/a Pediatric Sleep Specialists ("Pediatric Sleep Specialists") is a professional limited liability company organized under the laws of the State of Colorado, headquartered at 6071 E. Woodmen Road, Suite 225, Colorado Springs, Colorado 80923. On information and belief, its sole member is Dr. Viral Kothari.

54.     Defendant Alain Eid, M.D. ("Dr. Eid.") is the Medical Director of the Penrose-St. Francis Sleep Center. He is, on information and belief, a resident and citizen of Colorado.

55.     Defendant Christopher Pekurny, RRT ("Mr. Pekurny") is the Manager of Respiratory Services at St. Francis Hospital. Mr. Pekurny is a Registered Respiratory Therapist, and was Relator's immediate supervisor. He is, on information and belief, a resident and citizen of Colorado.

56.     Defendant Viral Kothari, M.D. ("Dr. Kothari") is the sole member of and, on information and belief, the sole physician employed by Pediatric Sleep Specialists. He is, on information and belief, a resident and citizen of Colorado.

## III.    JURISDICTION AND VENUE

57.     This Court has jurisdiction over the subject matter of this action pursuant to U.S.C §1331, 28 U.S.C. §1367, and 31 U.S.C. §3732.

58.     This Court may exercise personal jurisdiction over Defendants pursuant to 31 U.S.C. §3732(a) and because Defendants transact business in the District of Colorado.

59.     Venue is proper in this District pursuant to 31 U.S.C. §3732(a) because all Defendants can be found in, reside in, and transact business in the District of Colorado.  In addition, the False Claims Act violations, as alleged herein, occurred, and continue to occur, in this District.

## IV.    THE LAW

### A.    The Federal False Claims Act and Colorado Medicaid False Claims Act

60.     The Federal False Claims Act ("FCA") provides, among other things, that any person who (1) "knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval," or (2) "knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim" is liable to the United States for a civil monetary penalty plus treble damages.  31 U.S.C. §§ 3729(a)(1)(A)-(B).

61.     The term "knowingly" means "that a person, with respect to information (1) has actual knowledge of the information; (2) acts in deliberate ignorance of the truth or falsity of the information; or (3) acts in reckless disregard of the truth or falsity of the information."  31 U.S.C. §§ 3729(b)(1)(A)(i)-(iii).  Proof of specific intent to defraud is not required.   31 U.S.C. § 3729(b)(1)(B).

62.     The term "claim" means "any request or demand, whether under a contract or otherwise, for money or property and whether or not the United States has title to the money or property, that (1) is presented to an officer, employee, or agent of the United States; or (2) is made to a contractor, grantee, or other recipient, if the money or property is to be spent or used on the Government's behalf or to advance a Government program or interest, and if the United States Government (a) provides or has provided any portion of the money or property requested or demanded; or (b) will reimburse such contractor, grantee, or other recipient for any portion of the money or property which is requested or demanded …." 31 U.S.C. §§ 3729(b)(2)(A)(i)-(ii).

63.     "[T]he term 'material' means having a natural tendency to influence, or be capable of influencing, the payment or receipt of money or property." 31 U.S.C. § 3729(b)(4).

64.     The Colorado Medicaid False Claims Act, Colo. Rev. Stat. **§** 25.4-4-303.4 *et seq.* is modeled after the Federal FCA, and contains provisions similar to those quoted above. Relator asserts claims under the Colorado Medicaid False Claims Act for the state portion of the Medicaid false claims detailed in this complaint.

## V.     BACKGROUND REGARDING SLEEP TESTING

### A.     Sleep Testing in Adults

65.     The American Academy of Sleep Medicine (AASM) recognizes a number of different sleep disorders affecting millions of Americans.  Some of the most common of these disorders are insomnia, narcolepsy/excessive daytime sleepiness, restless leg syndrome, REM behavior disorders, and, most relevant to this case, obstructive sleep apnea ("OSA").[4]

66.     OSA is a condition where a patient's airways collapse during sleep, causing an obstruction past which the patient is unable to push adequate air.  OSA causes and/or worsens

---

[4] American Academy of Sleep Medicine, *Practice Guidelines,* aasm.org, available at https://aasm.org/clinical-resources/practice-standards/practice-guidelines/ (last accessed May 24, 2021).

certain comorbidities.  These comorbidities include heart disease, high blood pressure, and Type II diabetes.[5]

67.     OSA is a serious disorder. Left untreated, it can result in a number of negative symptoms and outcomes. These include, but are not limited to, fragmented sleep, hypoxia (insufficient oxygen reaching tissue), hypercapnia (excessive carbon dioxide in the blood), intrathoracic pressure changes, feelings of unrest, fatigue, daytime sleepiness, impairment in cognitive function, decline in overall quality of life, increased incidence of job-related and vehicular accidents, development of cardiovascular disease, and metabolic dysregulation.[6]

68.     The most common tool used to diagnose sleep disorders, particularly OSA, is polysomnographic diagnostic sleep testing ("PSG test").  The PSG test is a comprehensive recording of the biophysiological changes that occur during sleep.[7]

69.     According to the AASM's recommendations, a PSG test should be performed after a clinical evaluation, including a "thorough sleep history and a physical examination that includes the respiratory, cardiovascular, and neurologic systems."[8]

70.     Typically, a referring physician prescribes an initial PSG test because the physician suspects the patient suffers from OSA or another disorder that disrupts sleep.  The initial PSG test involves an over-night stay at the lab.  Prior to the test, electrodes are placed on the patient's head

---

[5] Timothy I. Morgenthaler, MD *et al*, *Practice Parameters for the Medical Therapy of Obstructive Sleep Apnea,* 29 SLEEP 1031, 1031 (2006), available at  https://j2vjt3dnbra3ps7ll1clb4q2-wpengine.netdna-ssl.com/wp-content/uploads/2017/07/PP_MedicalTherapyOSA.pdf .
[6] Vipesh K. Kapur, MD, MPH *et al*., *Clinical Practice Guideline for Diagnostic Testing for Adult Obstructive Sleep Apnea: An American Academy of Sleep Medicine Clinical Practice Guidelines*, 13 Journal of Clinical Sleep Medicine 479, 480 (2017), available at
https://www.ncbi.nlm.nih.gov/pmc/articles/PMC5337595/pdf/jcsm.13.3.479.pdf.
[7] *See generally* Clete. A. Kushida, MD, PHD, *et al*., *Practice Parameters for the Indications for Polysomnography and Related Procedures: An Update for 2005*, 28 Sleep 499 (2005).
[8] Vipesh K. Kapur, MD, MPH *et al*., *Clinical Practice Guideline for Diagnostic Testing for Adult Obstructive Sleep Apnea: An American Academy of Sleep Medicine Clinical Practice Guidelines*, 13 Journal of Clinical Sleep Medicine 479, 480 (2017), available at
https://www.ncbi.nlm.nih.gov/pmc/articles/PMC5337595/pdf/jcsm.13.3.479.pdf.

and body in order to monitor a number of bodily functions, including a patient's brainwaves, heart rhythm, breathing, and body movement.[9]

71.     The PSG test result is called a polysomnogram.  The polysomnogram is scored based on the Apnea Hypopnea Index (AHI) or the Respiratory Disturbance Index (RDI).  Both AHI and RDI scores record the average number of respiratory events meeting specific criteria a patient experiences per hour of sleep. The first respiratory events measured are apneas, defined as complete cessation of breathing for ten or more seconds. The second respiratory events measured are hypopneas, which are commonly defined as partial breathing obstruction for ten or more seconds. In addition to scoring apneas and hypopneas, the RDI also scores respiratory-effort related arousals (RERAs), events in which difficulty breathing causes a patient to wake up during sleep.

72.     Dfiagnostic criteria for OSA varies. The International Classification of Sleep Disorders (ICSD-3) defines the disorder as an RDI score greater than or equal to five if other OSA symptoms are present, or an RDI score greater than or equal to fifteen if no other OSA symptoms or present. Alternatively, OSA may be defined as follows: an AHI or RDI score of five to fifteen events per hour is classified as mild obstructive sleep apnea; fifteen to thirty events per hour as moderate OSA; and thirty or more events as severe OSA.  However, if the patient has significant comorbidities (e.g. high blood pressure, heart disease), then a lower AHI score qualifies the patient as having moderate or severe OSA.[10]

---

[9] *Id.*
[10] *Id.* at 480.

73.     Once scored, the physician interprets the test and determines whether to prescribe a subsequent CPAP Titration study ("CPAP test") and CPAP equipment, a medical device used to keep a patient's airway open during sleep so that unobstructed breathing becomes possible.[11]

74.     A CPAP machine consists of a motor and a face mask, connected via a hose. The motor receives ambient air and pressurizes it. The pressurized air flows through the hose into the face mask, clearing obstructions and preventing the airway from collapsing or becoming blocked. Depending on the severity of patient's condition, a CPAP may cover a patient's nose only or their nose and mouth.[12]

75.     A CPAP study can either be a full-night titration (in which the patient wears a CPAP mask for the entirety of the sleep study) or a split-night titration (in which the patient wears a CPAP mask for only part of the sleep study).[13]

76.     If prescribed, the patient then returns to the lab for the follow-up CPAP study.  The CPAP study is similar to the PSG test except that the CPAP study involves the patient wearing the CPAP device, which is a mask connected to a machine, so that the technologist can determine the correct amount of pressure required to eliminate the sleep disturbances and the correct fit and type of the mask.[14]

77.     If the CPAP sleep test is effective in reducing the patient's symptoms, the patient may then be prescribed to wear a CPAP device nightly.[15]

---

[11] *CPAP Machine: How It Works, Reasons, Uses, and Benefits for Sleep Apnea*, cpap.com (March 3, 2021), available at https://www.cpap.com/blog/cpap-machine-works-reasons-uses/.
[12] *Id.*
[13] *Id.*
[14] *Id.*
[15] *Id.*

B.    **Pediatric Sleep Testing**

78.    The course of diagnosis and treatment for children with sleep disorders, including and especially OSA, differs in several key respects from the diagnosis and treatment of adult sleep disorders and OSA.

79.    The AASM specifically recommends a "comprehensive history and physical examination" of a child as part of the diagnosis of a sleep disorder, including OSA.[16]

80.    The AASM recommends that, when a PSG test is performed on a child, (1) the child's caretaker should be present; (2) the parent and child should be given advance orientation to the sleep laboratory, "including, in some cases, the application of a limited number of sensors to illustrate the procedure to the child," (3)  the PSG technologist should be "***experienced and comfortable in dealing with children in the sleep laboratory environment that is child-friendly***" (emphasis added), and (4) that the sleep specialist should provide "specific guidance and recommendations in advance of the PSG with regard to the child's care during the night."[17]

81.    Pediatric OSA, unlike adult OSA, is usually caused by adenontonsillar hypertrophy—that is, enlargement of the adenoids and/or tonsils.[18]

82.    Because pediatric OSA is usually caused by enlargement of the adenoids and/or tonsils, AASM and the American Academy of Otolaryngology-Head and Neck Surgery Foundation recommend tonsillectomy (removal of the tonsils) or adenotonsillectomy (removal of the adenoids and tonsils) as a first-line treatment for a child diagnosed with OSA as determined after a PSG test. Unlike in adults, CPAP is typically *not* indicated as the first-line treatment for

---

[16] R. Nisha Aurora, MD *et al.*, *Practice Parameters for the Respiratory Indications for Polysomnography in Children*, 34 SLEEP 379, 380-81 (2011), available at https://www.ncbi.nlm.nih.gov/pmc/articles/PMC3041715/.
[17] *Id.* at 381.
[18] Michelle S. King, MD *et al.*, *Improving Positive Airway Pressure Adherence in Children*, 9(2) Sleep Med. Clini. 219, 219 (2014), available at https://www.ncbi.nlm.nih.gov/pmc/articles/PMC4042088/.

pediatric OSA. Rather, it is typically only used as a first-line treatment in obese children, or children who for various other reasons are poor candidates for surgical intervention.[19]

83.     Studies have shown that adenotonsillectomy and tonsillectomy have efficacy in improving behavior, quality of life, and polysomnographic scoring for children diagnosed with OSA.[20]

84.     Pediatric CPAP therapy is generally reserved for patients whose OSA symptoms tonsillectomy or adenotonsillectomy fail to resolve. These patients often have comorbid risk factors, including severe OSA, obesity, neuromuscular disorders, and craniofacial abnormalities.[21]

85.     Pediatric patients, especially pediatric patients with developmental delays, receiving CPAP therapy often "develop conditional anxiety because of poorly fitting equipment and repeated association of the sight, sound, and sensation of CPAP with discomfort from the mask, physiologic arousal from struggling, or both."[22]

## VI.     DEFENDANTS' ILLEGAL AND FRAUDULENT PRACTICES

### A.     Medically Unnecessary Sleep Tests

86.     Medicare, Medicaid and other federal health care programs only reimburse for medically necessary sleep tests.  42 U.S.C. § 1395y(a)(1)(A); 10 C.C.R. § 2505-10 8.76.8 (2021). TRICARE Policy Manual, 6010.60-M Chap. 11, Sect. 12.1, 2.3.7 (TRICARE does not cover

---

[19] Ron B. Mitchell, MD *et al.*, *Clinical Practice Guideline: Tonsillectomy in Children (Update)*, 160 Otolaryngology-Head and Neck Surgery S1, S2, S20-S21 (2019), available at https://journals.sagepub.com/doi/pdf/10.1177/0194599818801757. ("Clinicians should recommend tonsillectomy for children with obstructive sleep apnea documented by overnight polysomnography"). The guidelines are publication of the American Academy of Otolaryngology-Head and Neck Surgery Foundation (AAO-HNSF).  For purposes of these guidelines, "[o]besity is defined as body mass index (BMI ≥ 95th percentile." *Id.* at S17. AASM has endorsed these guidelines. Robin Lloyd, MD *et al*, *Letter to the Editor Regarding the Updated American Academy of Otalryngology-Head and Neck Surgery Foundation Clinical Practice Guideline on Tonsillectomy*, 15 Journal of Clinical Sleep *Medicine* 363, 363 (2019), available at https://jcsm.aasm.org/doi/pdf/10.5664/jcsm.7650.
[20] Michelle S. King, MD *et al.*, *Improving Positive Airway Pressure Adherence in Children*, 9(2) Sleep Med. Clini. 219, 219 (2014), available at https://www.ncbi.nlm.nih.gov/pmc/articles/PMC4042088/.
[21] *Id.*
[22] *Id.* at 221.

services if the provider does not meet the Medicare conditions of participation or conditions of coverage for substantially comparable services).

87.     Medical services, including PSG and CPAP tests, are excluded from coverage under Medicare Part B if they are "not reasonable and necessary for the diagnosis or treatment of illness or injury or to improve the functioning of a malformed body member[.]" 42 U.S.C. § 1395y(a)(1)(A).

88.     The federal government has identified fraud related to sleep testing as an area particularly warranting investigation and oversight.  In the HHS Office of Inspector General Report *Medicare Payments to Providers for Polysomnography Services Did Not Always Meet Medicare Billing Requirements*, published in June 2019, the OIG reported the results of an audit of Medicare payments for PSG tests. OIG reviewed a sample of claims related to two-hundred beneficiaries made over a two-year period (2014-2015). It found that eighty-three beneficiaries received services that should have been disallowed. The OIG report did not specify the providers whose claims it reviewed.[23]

89.     The cause for these disallowances in the audit included:

   a.   Incomplete provider documentation, including failure to maintain a record of the attending physician's order and medical record;

   b.   Providers failing to provide any appropriate documentation;

   c.   ***Technologists lacking required credentials;***

   d.   Provider billed for duplicative services; and

   e.   Services were incorrectly coded.[24]

---

[23] Joanne M. Chiedi (Acting Inspector General), *Medicare Payments to Providers for Polysomnography Services Did Not Always Meet Medicare Billing Requirements,* A-04-17-07069, Department of Health and Human Services Office of the Inspector General (June 2019), available at https://oig.hhs.gov/oas/reports/region4/41707069.asp.
[24] *Id.*

90.     Based on the sampling, the OIG found that, over the two year audit period, CMS likely overpaid for PSG tests by $269 million. Over that period, CMS made payments for PSG tests in the amount of $755 million. Accordingly, the estimated overpayment rate was approximately 35%. The OIG also found that CMS oversight of sleep laboratories had been insufficient.

91.     Similarly, Health First Colorado requires that all goods and services be medically necessary, and that such medical necessity be properly documented and demonstrated by records made at the time the goods and service were provided.[25]

92.     Throughout the relevant time period, Defendant Centura has improperly billed for the following sleep tests:

- **PSG Tests**:  were medically unnecessary because they were, *inter alia*, performed by non-credentialed technologists; performed without adequate physician supervision; and were interpreted by non-physicians;

- **CPAP Tests**:  were medically unnecessary because they were, *inter alia,* performed by non-credentialed technologists; were not medically necessary because they were not prescribed by the referring physician; were performed without adequate physician supervision; and were interpreted by non-physicians.

93.     Throughout the relevant time period, Defendant Pediatric Sleep Specialists has improperly billed for the following sleep tests:

- **PSG Tests**:  were medically unnecessary because they were, *inter alia*, performed by non-credentialed technologists; performed without adequate physician supervision; performed by individuals other than Defendant's employees; performed without adequate clinical assessment of the patient; and performed without adequate documentation of medical necessity;

---

[25] Colorado Department of Health Care Policy & Financing, *General Provider Information Manual*, "Benefits and Benefit Delivery Program" & "Record Keeping and Retention,"  available at https://hcpf.colorado.gov/gen-info-manual#BnBdelProg and https://hcpf.colorado.gov/gen-info-manual#recordretention (hereafter "Health First Colorado Provider Handbook"); *see also* 10 CCR § 2505-10 8.100.5.D ("Medicaid should be the payer of last resort for payment of medically necessary goods and services furnished to clients.").

- **CPAP Tests**:  were medically unnecessary because they were, *inter alia*, performed by non-credentialed technologists, performed inappropriately on pediatric patients despite not being indicated for said patients; performed without adequate clinical assessment of the patient or adequate documentation of medical necessity; and performed by individuals other than Defendant's employees.

1. **Centura falsely billed Medicare and TRICARE for sleep tests performed by non-physician personnel who did not possess the appropriate licenses, certification or credentials.**

   a. **Medicare and TRICARE prohibit non-credentialed technologists from performing sleep tests.**

94.     The Local Coverage Determination (LCD) for Outpatient Sleep Studies (L35050) issued by the Medicare Administrative Contractor for Colorado (Novitas Solutions, Inc.) details the requirements for sleep tests to be considered reasonable and necessary.  Among other requirements, PSG or CPAP tests must be attended by "an appropriately trained technologist."[26]

95.     In order to qualify as an "appropriately trained technologist," a technologist **must** possess one of the following credentials:

1. Board of Registered Polysomnographic Technologist ("BPRT"),

   a. Certified Polysomnographic Technician ("CPSGT"),

   b. Registered Polysomnography Technologist ("RPSGT");

2. National Board of Respiratory Care ("NBRC"),

   a. Certified Respiratory Therapist-Sleep Disorder Specialist ("CRT-SDS");

   b. Registered Respiratory Therapist—Sleep Disorder Specialist ("RRT-SDS"); or

3. American Board of Sleep Medicine ("ABSM")

---

[26] Local Coverage Determination L35050, effective 10/01/2015, revised 1/1/2021, available at https://www.cms.gov/medicare-coverage-database/details/lcd-details.aspx?lcdid=35050&ver=55&bc=CAAAAAAAAAAA

a.   Registered Sleep Technologist ("RST").[27]

96.     Thus, in Colorado, Medicare will not pay for diagnostic tests performed by non-credentialed technologists.

97.     Similarly, TRICARE will not pay for diagnostic tests performed by non-credentialed technologists, because TRICARE will not cover services not covered by Medicare. TRICARE Policy Manual, 6010.60-M Chap. 11, Sect. 12.1, 2.3.7 (TRICARE does not cover services if the provider does not meet the Medicare conditions of participation or conditions of coverage for substantially comparable services; it also requires accreditation from a Qualified Accreditation Organization).

> **b.   Despite these prohibitions, Penrose-St. Francis Sleep Center routinely allows non-credentialed technologists to perform unsupervised sleep tests, then unlawfully bills Medicare and TRICARE for their services.**

98.     Non-credentialed technologists have routinely conducted sleep tests for Medicare and TRICARE patients at Penrose-St. Francis Sleep Center.  These non-credentialed technologists are not qualified or properly trained to conduct these sleep tests.

99.     Between January and April 2021, while Relator was employed as a sleep technologist at Penrose-St. Francis Sleep Center, Centura employed multiple sleep technologists who were not credentialed by any recognized credentialing body.  During Relator's employment, five non-credentialed technologists were employed to administer sleep tests, while only four credentialed technologists administered sleep tests. An additional two credentialed technologists were employed for the dayshift at Penrose-St. Francis Sleep Center. However, these dayshift technologists did not see patients.

---

[27] *Id.*

100.    The non-credentialed technologists with whom Relator worked at Penrose-St. Francis Sleep Center between January and April 2021 were: Judy Garner, Alma Espinoza, Bikosh Dhakal, Holly Tyler, and Christopher Abeyta. On information and belief, all of these non-credentialed technologists had worked at Penrose-St. Francis Sleep Center for at least a year. Judy Garner told Relator that she had worked as a non-credentialed technologist for over two-years without passing her credentialing examination, which she had failed on six or seven occasions.

101.    The credentialed technologists with whom Relator worked at Penrose-St. Francis Sleep Center between January and April 2021 were: Jose ("Miguel") Marquez III, Christina Opper, and Cristine McAfee. Cristine McAfee's employment was terminated in February or March of 2021.

102.    Additionally, Penrose-St. Francis Sleep Center employed two other credentialed technologists who worked the dayshift: Athena Stroud, and Makalah Garner, as well as Carrie Tyler, a Respiratory Therapist. Athena Stroud held the position of lead technologist. None of these credentialed technologists saw patients. Rather, they worked Penrose-St. Francis Sleep Center's day shift and scored tests. As described *infra*, their scoring of tests violated Medicare and TRICARE rules requiring that physicians interpret test results.

103.    Judy Garner, one of the non-credentialed technologists, oversaw and, on information and belief, continues to oversee shift schedules at Penrose-St. Francis Sleep Center. Penrose-St. Francis Sleep Center is normally open seven nights a week and has three technologists scheduled for each night to see six patients. When an opening in a shift appears, Judy Garner generally fills the shift herself, rather than letting a credentialed technologist take the shift.

104.    Attached as Exhibit 1 is the technologist schedule for March 2021, prepared by Judy Garner. On five of the thirty-one days in which Penrose-St. Francis Sleep Center saw patients

29

in March 2021, *no* credentialed technologists were scheduled (March 4, 2021; March 5, 2021; March 12, 2021; March 13, 2021; and March 19, 2021). On twelve of the thirty-one days, two out of three of the technologists scheduled were non-credentialed technologists (March 6, 2021; March 11, 2021; March 14, 2021; March 18, 2021; March 20, 2021; March 21, 2021; March 22, 2021, March 24, 2021, March 25, 2021; March 26, 2021; March 27, 2021; and March 28, 2021). On twelve of the thirty-one days, one non-credentialed technologist was scheduled along with two credentialed technologists (March 1, 2021; March 2, 2021; March 3, 2021; March 7, 2021; March 9, 2021; March 15, 2021; March 16, 2021; March 17, 2021; March 23, 2021; March 24, 2021; March 29, 2021; and March 30, 2021). In the entire month of March 2021, there were only two nights in which *only* credentialed sleep technologists were scheduled (March 10, 2021; and March 31, 2021).

105.    Attached as Exhibit 2 is the technologist schedule for April 2021, prepared by Judy Garner. On ten of the twenty-nine days[28] in which Penrose-St. Francis Sleep Center saw patients in April 2021, *no* credentialed technologists were scheduled (April 2, 2021; April 3, 2021; April 9, 2021; April 14, 2021; April 15, 2021; April 16, 2021; April 17, 2021; April 23, 2021; April 24, 2021; and April 30, 2021). On eight of the twenty-nine days, two of the three technologists scheduled were non-credentialed technologists (April 1, 2021; April 7, 2021; April 8, 2021; April 10, 2021; April 21, 2021; April 22, 2021; April 28, 2021; and April 29, 2021). On eleven of the twenty-nine days, one non-credentialed technologist was scheduled along with two credentialed technologists (April 5, 2021; April 6, 2021; April 11, 2021; April 12, 2021; April 13, 2021; April 18, 2021; April 19, 2021; April 20, 2021; April 25, 2021; April 26, 2021; and April 27, 2021). On no occasion in April 2021 were *only* credentialed technologists scheduled for a shift. Because

---

[28] Penrose-St. Francis Sleep Center was closed for Easter on April 4, 2021.

Relator left her employment on April 9, 2021, even fewer shifts may have been even partially covered by a credentialed technologist.

106.     Attached as Exhibit 3 is the technologist schedule sign-up sheet for May 2021, which was made available to staff in early March 2021. This sign-up sheet shows the first-come, first-served basis of scheduling sleep technologists at Penrose-St. Francis Sleep Center; that is, scheduling was and is essentially at random, without any consideration to the balance of credentialed versus non-credentialed technologists on a given shift. Additionally, it is clear from the first-come, first-served scheduling that Centura made no special effort to ensure that credentialed technologists were available on nights when Medicare and TRICARE patients were to be seen (as opposed to Health First Colorado and private insurance patients, who legally could be seen by non-credentialed technologists under adequate supervision).

107.     Indeed, in response to the Centura management's decision to switch Penrose--St. Francis Sleep Center to a two staff per night schedule for Sundays through Tuesdays, Judy Garner, acting as shift-manager, crossed Relator's name out from the staffing schedule for thirteen shifts. As a result, as scheduled, several of these shifts would lack any credentialed sleep technologists.

108.     While Relator worked at Penrose--St. Francis Sleep Center, credentialed technologists were not given any supervisory authority over the non-credentialed technologists.

109.     On multiple occasions, Relator was told by non-credentialed technologists that her credentials were irrelevant, that the non-credentialed technologists were better at their jobs than the credentialed technologists, that the non-credentialed technologists were senior to Relator and other credentialed technologists, and that Centura Sleep Center had always operated using non-credentialed technologists.

110. Ms. Garner told Relator that she had failed her credentialing test on six or seven occasions over a greater than two-year period, and yet still maintained her employment. She stopped taking the test because she could no longer afford it (the licensure test to become an RPSGT costs $550). Ms. Garner stated that Mr. Pekurny had told the technologists not to worry about their repeated failures, and that their employment was not in danger.

111. During Relator's employment at Penrose-St. Francis Sleep-St. Francis Center, there was simply no direct supervision of non-credentialed technologists. Credentialed technologists had no supervisory authority over the non-credentialed technologists, and neither Dr. Eid nor any other physician directly supervised the sleep studies, or was even physically present in the sleep laboratory. Non-credentialed technologists routinely saw patients alone, without the assistance or supervision of credentialed technologists.

> **c.     Penrose-St. Francis Sleep Center's policy of allowing non-credentialed sleep technologists to perform sleep tests was long-standing, and Centura was aware that the practice was illegal.**

112. Based on conversations Relator had with other sleep technologists and Mr. Pekurny, Penrose-St. Francis Sleep Center's policy of allowing non-credentialed sleep to perform unsupervised sleep tests predated her employment by several years.

113. At one point during a sleep laboratory shift, Ms. Garner told Relator that Penrose-St. Francis Sleep Center had, some years previously, employed a credentialed technologist whose nominal job was to supervise the non-credentialed technologists. This credentialed technologist was not paid a full salary, and did not actually perform any supervisory duties. Rather, the credentialed technologist slept through the nightshifts. Eventually, Centura determined that it did not even need this fig leaf of regulatory compliance, and ceased employing a nominal supervising credentialed technologist.

32

114.    The fact that Centura previously employed a supervisory credentialed technologist indicates that Centura was aware that allowing non-credentialed technologists to work independently was unlawful.

115.    The fact that Centura (as well as Mr. Pekurny) was aware that this practice was unlawful is further evidenced by Mr. Pekurny's reaction to an internal whistleblowing report. In February or March 2021, after Cristine McAfee's employment with Centura Sleep Center was terminated due to a dispute between Ms. McAfee and a patient, Ms. McAfee reported the issue of non-credentialed technologists performing sleep studies to Centura's Human Resources Department. Mr. Pekurny, in his role as Manager of Respiratory Services, discussed Ms. McAfee's report internally with Relator and other Penrose-St. Francis Sleep Center technologists.   Mr. Pekurny told Relator and the other technologists that "Christina had screwed us," and instructed the technologists to "say as little as possible" and give non-responsive answers to HR inquiries, in order to avoid making a "bigger issue" of the use of non-credentialed technologists.

116.    Mr. Pekurny's instructions evidences his knowledge that the practice of allowing non-credentialed technologists to perform sleep studies was unlawful.

117.    On March 19, 2021, Relator sent an email to Mr. Pekurny in which she raised the same concerns that non-credentialed technologists were seeing patients without supervision. Christopher Perkuney replied that, while he was looking into the issue, that "it is my understanding that the need for a registered tech is for stand-alone sleep labs. Plus Athena does an overview and critique if needed over every sleep study she scores which would be considered oversight by a registered tech."  A copy of this email exchanged is attached as Exhibit 4.

118.    Mr. Pekurny's contention that a hospital sleep laboratory, as opposed to an independent sleep laboratory, need not employ credentialed technologists is plainly contradicted

by L35050. Further, Athena Stroud could not possibly have provided adequate supervision of the non-credentialed technologists, as she exclusively worked the dayshift at Penrose-St. Francis Sleep Center, and the sleep studies occurred exclusively during the nightshift.

### d. Penrose-St. Francis Sleep Center's employment of non-credentialed technologists harmed patients.

119.    Relator personally observed how the lack of proper credentialing of sleep technologists harmed patients, including pediatric patients.

120.    Because credentialed and non-credentialed technologists at Penrose-St. Francis Sleep Center wear identical badges, patients have no way to know that their sleep tests are being performed by unqualified individuals.

121.    On the night of March 27, 2021, Penrose-St. Francis Sleep Center was staffed by Relator, Judy Garner ("Ms. Garner"), and Holly Tyler ("Ms. Tyler"), both of whom are non-credentialed. During the shift, Relator heard a pediatric patient being seen by Ms. Tyler crying for an extended period of time. The pediatric patient cried out for his father, saying that he would be a good boy if he could go home. Relator knew, based on her review of the patient's prescription, that he was supposed to receive a PSG test. Relator went to the patient's room and knocked on the door, offering to help Ms. Tyler. When Relator opened the door, she observed that Ms. Tyler had incorrectly applied a CPAP mask to the patient, who was a child between six and eight years old. The patient was present with his father. Relator immediately told Ms. Tyler that the patient was not prescribed to receive a CPAP test. Ms. Tyler told Relator to leave the room. Ms. Tyler followed her out of the room, and berated Relator for interfering with her patients. Ms. Tyler stated that Relator had no supervisory authority over her, and that "being registered is just a piece of paper." Ms. Garner, who was also on duty that night, joined Ms. Tyler in berating Relator, stating that they were actually senior to Relator, because they had worked at Penrose-St. Francis Sleep Center for

longer. Ms. Tyler persisted in refusing to remove the child from the CPAP machine for another forty minutes, approximately. At around 11pm, the patient's father came out of the room, and told Ms. Tyler that his son was continuing to cry and could not sleep, and that he would be taking him home. Ms. Tyler finally agreed to remove the CPAP mask from the child to "settle him down." The child finally received the PSG test he was prescribed. The child's unprescribed CPAP test began at 7pm. He spent four hours receiving a medically unnecessary, unprescribed, deeply uncomfortable, and perhaps even traumatizing treatment.

122.    Relator promptly reported this incident via email to Christopher Pekurny, the Manager of Respiratory Services for Centura Health St. Francis Hospital. This email is attached as Exhibit 5.

123.    Additionally, Relator believes this incident was recorded through Penrose-St. Francis Sleep Center's camera system. All sleep studies performed at Penrose-St. Francis Sleep Center are filmed. The recording is preserved for use in scoring the sleep studies. These recordings corroborate Relator's allegations that non-credentialed sleep technologist unlawfully perform sleep studies on Medicare and TRICARE patients.

124.    CPAP tests are not normally indicated for pediatric patients. As discussed *supra*, the American Academy of Sleep Medicine recommends adenotonsillectomy as the first-line treatment for most instances of pediatric obstructive sleep apnea. Accordingly, a credentialed technologist would have likely not made the same mistake Ms. Tyler did, which caused extreme distress and discomfort to the pediatric patient.

125.    Relator also observed other examples of mistakes and unprofessional behavior from non-credentialed technologists. For example, Relator observed Ms. Garner sleeping during her shift on multiple occasions, ignoring the needs of her patients.

126.    This culture of impunity and autonomy for non-credentialed technologists was pervasive during Relator's tenure at Centura Sleep Center.

> **e.    The policy of allowing non-credentialed technologists to perform sleep studies is Centura-wide.**

127.    Relator has uncovered significant evidence that the policy of allowing non-credentialed technologists to perform sleep studies was not limited to Penrose-St. Francis Sleep Center, but occurred throughout the Centura system.

128.    Prior to working at Penrose-St. Francis Sleep Center, Relator worked as a sleep technologist at Parkview Medical Center in Pueblo, Colorado in 2018. Parkview, which is not affiliated with Centura, employed sleep technologists and physicians who were also employed at a now-defunct Centura sleep laboratory, St. Mary-Corwin Sleep Center. Relator recalls conversations with dual-employed physicians and sleep technologists—including, specifically, Dr. Marcel Jungueira—where it was mentioned that St. Mary-Corwin employed non-credentialed technologists.

129.    After she ended her employment at Penrose-St. Francis Sleep Center, Relator discovered two April 2021 job postings on indeed.com, a job classifieds website, for Polysomnographic Technologist (i.e., sleep technologist) positions at two different Centura sleep laboratories: St. Thomas More and Four Corners.

130.    In August 2021, three more job advertisements were posted on linkedin.com, also a job classifieds website, as well as Centura's corporate website, for Polysomnographic Technologist positions at St. Thomas More, Four Corners, and Penrose-St. Francis Sleep Center.

131.    All of these job postings state, "The Polysomnographic Technologist is an individual who possess the necessary skills to perform specialty diagnostic and therapeutic procedures related to sleep disorders. This includes, but is not limited to diagnostic

polysomnography, Split Night testing, CPAP, Bi-Level, Auto-Servo Ventilation (ASV), Oxygen titrations, and End Tidal CO2 monitoring. The Polysomnographic Technologist **must be able to work independently**." (emphasis added). A copy of the April 2021 Four Corners job posting is attached as Exhibit 6; a copy of the April 2021 St. Thomas More job posting is attached as Exhibit 7; a copy of the August 2021 Four Corners job posting is attached as Exhibit 8; a copy of the August 2021 St. Thomas More job posting is attached as Exhibit 9; and a copy of the August 2021 Penrose-St. Francis Sleep Center job posting is attached as Exhibit 10.

132.    Despite stating that a sleep technologist must work **independently**, neither Centura sleep laboratory requires its technologists to be properly credentialed upon hire. Rather, they both list the following qualification: "Registered Polysomnographic Technologist Credential from the Board of Registered Polysomnographic Technologists (BRPT) upon hire **or within 2 years**."

133.    Accordingly, Relator alleges that Centura has a long-standing, continuous, and system-wide policy of hiring non-credentialed technologists to independently perform sleep tests.

134.    On information and belief, Centura has billed Medicare and TRICARE for sleep tests performed non-credentialed technologists, in blatant violation of L35050. Centura was aware that this practice constituted a violation of the False Claims Act, or acted with reckless disregard or deliberate ignorance towards that fact.

135.    On information and belief, Mr. Pekurny caused Centura to bill Medicare and TRICARE for sleep tests performed by non-credentialed technologists at Penrose-St. Francis Sleep Center. Mr. Pekurny was aware that this practice was unlawful and violated the False Claims Act, or acted with reckless disregard or deliberate ignorance towards that fact.

136.    On information and belief, Dr. Eid, through his failure to properly supervise Penrose-St. Francis Sleep Laboratory, caused Centura to bill Medicare and TRICARE for sleep

37

tests performed by non-credentialed technologists at Penrose-St. Francis Sleep Center. Dr. Eid either acted knowingly, or with reckless disregard or deliberate ignorance towards the unlawful billing occurring at Penrose-St. Francis Sleep Center.

> **2.**    **Pediatric Sleep Specialists Also Falsely Billed Medicare and TRICARE for Sleep Tests Performed by Non-Physician Personnel Who Did Not Possess the Appropriate Licenses, Certification or Credentialing.**

137.    Pediatric Sleep Specialists regularly rents beds from Centura at the Penrose-St. Francis Sleep Center in order to perform sleep studies prescribed by Dr. Kothari.

138.    Pediatric Sleep Specialists' arrangement with Centura allows Pediatric Sleep Specialist to use Penrose-St. Francis Sleep Center sleep technologists to perform these sleep studies on pediatric patients.

139.    Pediatric Sleep Specialists was responsible for billing its own patients' insurance, including their government insurance.

140.    The majority of Pediatric Sleep Specialists patients had Medicaid. A significant portion had Medicare or TRICARE.

141.    Pediatric Sleep Specialists, through its principal Dr. Kothari, was aware that Centura employed non-credentialed technologists, and thus knew that many of the sleep tests it performed at the Penrose-St. Francis Sleep Center were performed by non-credentialed technologists.

142.    This is evidenced by the fact that although under Medicare and Medicaid regulations, Dr. Eid, as the medical director of Penrose-St. Francis Sleep Center, was responsible for providing basic training to the technologists working at the Center, Dr. Kothari took it upon himself to invite technologists to attend so-called "March Madness" training sessions in March 2021. These "March Madness" training sessions were held remotely by Zoom. Relator was one of

two technologists to attend. The other was Jose Marquez, who, like Relator, was among the minority of credentialed technologists at Penrose-St. Francis Sleep Center. These "March Madness" training sessions were remedial in nature, expounding the most basic concepts related to sleep studies, including, for example, how to apply the electrodes attached to a patient's body, and how to apply the paste used to attach the electrodes to the patient's body. Any credentialed sleep technologist would be expected to be very familiar with the concepts explained.

143.    During these "March Madness" training sessions, Dr. Kothari asked Relator and Mr. Marquez whether they were studying for their licensure tests, and when would they be taking those tests. This indicates that Dr. Kothari and Pediatric Sleep Specialists were and are aware that Penrose-St. Francis Sleep Center employed non-credentialed technologists.

144.    Dr. Kothari and Pediatric Sleep Specialists also are aware that non-credentialed technologists perform sleep studies at Centura because Pediatric Sleep Specialists receives reports from Penrose-St. Francis Sleep Center for each PSG or CPAP test administered. These reports contain the name of the technologist who administered the sleep study. If the technologist is credentialed, their post-nominal initials will appear after their name; if the technologist is not credentialed, only their name will appear (that is, a report from a patient that Relator had seen would contain the text "Kimberly Begano, RPSGT," while a report from a patient that a non-credentialed technologist like Ms. Garner had seen would read simply "Judy Garner"). Based on these reports, Pediatric Sleep Specialists must be aware that some of the sleep studies performed on its behalf at Penrose-St. Francis Sleep Center are administered by non-credentialed technologists.

145.    Pediatric Sleep Specialists was thus aware that many of its sleep studies were performed by non-credentialed technologists, or at minimum acted in reckless disregard or willful

ignorance of that fact. Nonetheless, it continued to bill Medicare and TRICARE for these sleep studies, in blatant violation of L35050.

146.     Dr. Kothari was also aware that many of the sleep studies he prescribed were performed by non-credentialed technologists, or at a minimum acted in reckless disregard or willful ignorance of that fact. Nonetheless, he continued to cause Pediatric Sleep Specialists to bill Medicare and Tricare for these tests, also in violation of L35050.

### 3. Centura Falsely Billed Medicare, TRICARE, and Medicaid by Presenting Claims for Sleep Tests That Were Inadequately Supervised, or Had Not Been Interpreted by a Physician.

#### a. Centura provided inadequate supervision to sleep technologists.

147.     Under Medicare and TRICARE requirements, for most diagnostic tests, including PSG tests, "general supervision" by a physician is required. 42 C.F.R. §410.32(b)(3).  To satisfy the criteria for providing "general supervision," a physician is not required to be present during the performance of the test. However, the physician must exercise overall direction and control over the procedure.  The supervising physician is also responsible for the training of non-physician personnel who actually conduct the tests.  42 C.F.R. §410.32(b)(3)(i).

148.     Under Health First Colorado requirements, subject to certain irrelevant exceptions, "**a non-physician provider may provide covered goods and services only under the Direct Supervision of an enrolled provider who has the authority to supervise those services, according to the Colorado Department of Regulatory Agencies rules**." 10 CCR 2505-8.200.2.D(1). "Direct Supervision means the supervising provider shall be on-site during the rendering of services and immediately available to give assistance and direction throughout the performance of the service." 10 CCR 2505-8.200.1.A.

149.    Additionally, Health First Colorado requirements state that **"Licensure and required certification for all physician services providers must be in accordance with their specific specialty practice act and with current state licensure statutes and regulations."** 10 CCR 2505-8.200.2.D(1).

150.    Under the Colorado Respiratory Therapist Practice Act, the text of which appears on the website of the Colorado Department of Regulatory Agencies, a sleep technologist does not need to be credentialed in order to legally provide technologist services. However, an unregistered technologist "shall only practice under the supervision of a respiratory therapist, a physician, or an individual exempted from the provisions of this article pursuant to paragraph (g) of this subsection (2)." CO Rev Stat §12-41.5-110(2)(a)(II) (2017).

151.    An "individual exempted from the provisions of this article pursuant to paragraph (g) of this subsection (2)" refers to "certified pulmonary function technologists, registered pulmonary function technologists, registered polysomnographic technologists, or others who hold credentials from a nationally recognized organization as determined by the director; except that the scope of practice of a registered polysomnographic technologist must not exceed oxygen titration with pulse oximetry and noninvasive positive pressure ventilation titration." CO Rev Stat §12-41.5-110(2)(g) (2017). Thus, at minimum, in order to lawfully bill Health First Colorado for the services of a non-credentialed technologists, those non-credentialed technologists must be under the direct supervision of a credentialed technologist.

152.    During Relator's employment with Centura, Defendant Dr. Eid was the nominal supervising physician for Penrose-St. Francis Sleep Center, yet he did not exercise overall direction and control over the sleep tests.

153.    Neither Dr. Eid nor any other physician was ever present at Penrose-St. Francis Sleep Center during any shift that Relator worked, or, on information and belief, during any shift that occurred during her employment (and, again on information and belief, for some period before Relator's employment, and continuing after her employment).

154.    Neither Dr. Eid nor any other physician was available to provide guidance or instruction to Relator or other sleep technologists during any shift Relator worked, or, on information and belief, during any shift that occurred during her employment (and, again on information and belief, for some period before Relator's employment, and continuing after her employment).

155.    Neither Dr. Eid nor any other physician directly provided instruction[29] to Relator or any other technologist during any shift Relator worked (and, again on information and belief, for some period before Relator's employment, and continuing after her employment).

156.    Dr. Eid's name did not appear on the formal Policies and Procedures of Penrose-St. Francis Sleep Center distributed to sleep technologists, nor did the name of any other physician.

157.    During Relator's employment, Dr. Eid did not once arrange for a training for the sleep technologists. Based on Relators' conversations with other sleep technologists working at Penrose-St. Francis Sleep Center, both credentialed and non-credentialed, an official Centura-sponsored sleep technologist training had not occurred in years.  The only trainings ever held for the sleep technologists were Dr. Kothari's previously discussed "March Madness" sessions, which were informal, remedial in nature, non-mandatory, and poorly attended.

---

[29] With the exception of the physician prescriptions ordering sleep studies.

158.    Dr. Eid's failure to provide ongoing training to the sleep technologists at Penrose-St. Francis Sleep Center was particularly egregious given the frequent instances of incompetence on the part of non-credentialed sleep technologists, as described herein.

159.    Relator did not learn Dr. Eid's *name* until near the end of her employment with Penrose-St. Francis Sleep Center, while she was in the process of reporting the fraudulent conduct described herein to Centura's human resources department. At no point was she provided a number at which to reach Dr. Eid, and, on information and belief, no sleep technologist was provided with such a number.

160.    As alleged *supra*, credentialed technologists like Relator had no supervisory authority over the non-credentialed technologists.

161.    In sum, although only general supervision by a physician is required for sleep tests to be billed to Medicare and TRICARE, Dr. Eid's level of supervision failed and continues to fail to meet even that standard.   He did not exercise overall direction and control over the testing procedures.   See 42 C.F.R. §410.32(b)(1).   He also failed to fulfill his responsibility to train Penrose-St. Francis Sleep Center's non-physician personnel in polysomnographic testing procedures.   See 42 C.F.R. §410.32(b)(3)(i).

162.    Any sleep tests performed by Penrose-St. Francis Sleep Center's sleep technologists under insufficient physician supervision are not payable by Medicare and TRICARE.

163.    Further, any sleep tests performed by Penrose-St. Francis Sleep Center's non-credentialed technologists under insufficient supervision, as defined above, are not payable by Health First Colorado.

164.    Upon information and belief, Centura has nevertheless knowingly submitted, and continues to submit claims to Medicare, TRICARE, and Health First Colorado for sleep tests that are conducted under insufficient supervision at Penrose-St. Francis Sleep Center.

165.    On information and belief, Dr. Eid has caused and continues to cause Centura to submit claims to Medicare, TRICARE, and Health First Colorado for sleep tests that he knew or knows were conducted under insufficient supervision at Penrose-St. Francis Sleep Center.

### b.  Centura billed for sleep studies unlawfully interpreted by non-physicians.

166.    The Local Coverage Determination (LCD) for Outpatient Sleep Studies (L35050) issued by the Medicare Administrative Contractor for Colorado (Novitas Solutions, Inc.) clearly states that "[a]ll Sleep Studies, whether in a facility based, or OCST shall be interpreted by an appropriate physician with training in this area. Acceptable Board Certifications include American Board of Sleep Medicine or the American Board of Medical Specialties with a certification in Sleep Medicine." A sleep test must be scored by an appropriately certified physician in order to be lawfully billable to Medicare in Colorado.

167.    Similarly, TRICARE will not pay for sleep tests scored by anyone other than an appropriately certified physician, because TRICARE will not cover services not covered by Medicare. TRICARE Policy Manual, 6010.60-M Chap. 11, Sect. 12.1, 2.3.7 (TRICARE does not cover services if the provider does not meet the Medicare conditions of participation or conditions of coverage for substantially comparable services).

168.    While Dr. Eid, the medical director of Penrose-St. Francis Sleep Center, does possess a certification from the American Board of Sleep Medicine, he does not actually score and interpret the results of sleep studies performed at Penrose-St. Francis Sleep Center.

169.    Rather, the day-shift technologists, Athena Stroud and Carrie Tyler, were responsible for finalizing scores and interpreting sleep tests. These scores were signed-off by physicians employed at Penrose-St. Francis Sleep Center, but the interpretations were not actually performed by those physicians.

170.    The fact that Athena Stroud—who is not a physician—was primarily responsible for interpreting sleep studies was referenced in the March 19, 2021 email exchange between Relator and Christopher Pekurny, in which Mr. Pekurny wrote, "Plus Athena does an overview and critique if needed over every sleep study she scores which would be considered oversight by a registered tech." *See* Ex. 4.

171.    Despite the fact that sleep tests were not actually scored and interpreted by an appropriately certified physicians as required, on information and belief, Centura billed and continues to bill Medicare and TRICARE for these tests.

172.    On information and belief, Dr. Eid has knowingly caused and continues to cause Centura to bill Medicare and TRICARE for sleep test that were not billed by an appropriately certified physician.

**4.      Dr. Kothari and Pediatric Sleep Specialists Routinely Billed for Medically Unnecessary CPAP Tests.**

173.    Under Medicare and TRICARE, coverage is excluded for items and services that "are not reasonable and necessary for the diagnosis or treatment of illness or injury or to improve the functioning of a malformed body member." 42 U.S.C. § 1395y(a)(1)(A).

174.    Under Colorado Health First, "medical necessity" is defined as follows: "Medical necessity means a Medical Assistance program good or service:

a.    Will, or is reasonably expected to prevent, diagnose, cure, correct, reduce, or ameliorate the pain and suffering, or the physical, mental, cognitive, or

developmental effects of an illness, condition, injury, or disability. This may

include a course of treatment that includes mere observation or no treatment at all;

b.   Is provided in accordance with generally accepted professional standards for health

care in the United States;

c.   Is clinically appropriate in terms of type, frequency, extent, site, and duration;

d.   Is not primarily for the economic benefit of the provider or primarily for the

convenience of the client, caretaker, or provider;

e.   Is delivered in the most appropriate setting(s) required by the client's condition;

f.   Is not experimental or investigational; and

g.   Is not more costly than other equally effective treatment options."

10 CCR 2505-10 8.000(8).

175.    As discussed at length above, CPAP is not indicated as a first-line treatment for the

vast majority of pediatric patients diagnosed with OSA. Rather, the first-line treatment for pediatric

OSA is adenotonsillectomy.

176.    Nonetheless, rather than referring his pediatric patients to adenotonsillectomy, Dr.

Kothari routinely orders CPAP titration for his pediatric patients following one or multiple PSG

tests.

177.    During the course of her employment at Penrose-St. Francis Sleep Center, Relator

observed multiple pediatric patients who were inappropriately prescribed CPAP tests. These

patients had never undergone adenotonsillectomy and were not otherwise good candidates for

CPAP as a first-line treatment.

178.    On information and belief, Pediatric Sleep Specialists has billed Medicare,

TRICARE, and Medicaid for these medically unnecessary CPAP titrations. Pediatric Sleep

46

Specialists knew that these tests were medically unnecessary, or acted with reckless disregard or deliberate ignorance towards the fact that they were medically unnecessary.

179.    On information and belief, Dr. Kothari has caused and continues to cause Pediatric Sleep Specialists to bill Medicare, TRICARE, and Medicaid for these medically unnecessary CPAP titrations. Dr. Kothari knew that these tests were medically unnecessary, or acted with reckless disregard or deliberate ignorance towards the fact that they were medically unnecessary.

### 5.    Centura falsely billed Medicare, TRICARE, and Health First Colorado for CPAP Tests That Were Not Prescribed by a Physician.

180.    Penrose-St. Francis Sleep Center routinely directed its sleep technologists to provide CPAP testing to patients, even when that testing was not prescribed by a referring physician.  This was accomplished by converting physician-ordered PSG tests into split-night titrations, in which the patient spends the first half the sleep study ( a minimum of three hours) undergoing PSG diagnosis, and, if certain AHI/RDI criteria are met, the second half of the sleep study on a CPAP machine.  "Titration" refers to the administration of positive airway pressure via a CPAP machine; a full-night CPAP test is also referred to as a "full-night titration."

181.    Medicare and TRICARE permit credentialed technologists to determine whether, during the course of a split-night titration, a "study shows severe enough disease to merit treatment with CPAP."[30] However, a sleep technologist may not simply convert a standard PSG test into a split-night titration without a physician's prescription, as outlined in L35050: "The use of CPAP

---

[30] Local Coverage Determination L35050, effective 10/01/2015, revised 1/1/2021, available at https://www.cms.gov/medicare-coverage-database/details/lcd-details.aspx?lcdid=35050&ver=55&bc=CAAAAAAAAAAA

devices is covered under Medicare when ordered and prescribed by the licensed treating physician to be used in adult patients with OSA" if certain AHI/RDI criteria are met.[31]

182.    Additionally, Health First Colorado allows non-physicians to order medical services only under specific conditions, none of which apply to sleep technologists converting physician-ordered PSG tests into split-night titrations. *See generally* 10 CCR 2505-10 8.200 *et seq.*

183.    Despite these requirements that a physician specifically order a split-night titration test, during Relator's employment (and on information and belief, before and after it), Penrose-St. Francis Sleep Center had a policy that, unless a referring physician's PSG order specifically stated that it was diagnostic only, that a sleep technologist was to convert the test into a split-night titration if there were sufficient AHI/RDI indications in the first three hours of a patients' sleep study.

184.    Relator was informed of this policy by the lead technologist, Athena Stroud, in a text message dated March 18, 2021. Ms. Stroud instructed Relator, "If it [i.e., an order] doesnt [sic] specifically say "diagnostic only" then split if indicated." Relator had been inquiring about an physicians' order that was coded with the CPT code 95810, which indicates a diagnostic study only, rather than CPT code 95811, which indicates a split-night titration, or a full-night titration. A copy of this text message exchange is attached as Exhibit 11.

185.    Relator refused to comply with these improper instructions, and reported the instructions to Gretchen Anaya Quiroga, a Centura Human Resources officer. However, other technologists routinely complied with this instruction.

186.    At the end of a sleep study, sleep technologists enter certain information into the "EPIC" Centura computer system to document the services performed. The information entered

---

[31] *Id.*

into the EPIC system includes the start and end time for each the study, the patient's neck circumference in centimeters, and the CPT code for services rendered. On information and belief, the CPT code entered into the EPIC computer system is the CPT code used in the final CMS Form 1500 used to submit claims to Medicare, TRICARE, and Health First Colorado. When a sleep technologist converts an ordered PSG test into a split-night titration, they enter CPT code 95811, rather than the ordered CPT code 95810.

187.   This practice is profitable for Centura, because CPT code 95811 is more remunerative than CPT code 95810. Specifically, under the current Medicare fee schedule in MAC locality 0411201, which covers the entire State of Colorado, CPT code 95811 is compensated at a rate of $680.87 per service, while CPT code 95810 is compensated at a rate of $652.16 per service.[32]  Under the Health First Colorado fee schedule, CPT code 95811 is compensated at a rate of $669.92 per service, while CPT code 95810 is compensated at a rate of $648.07 per service.[33]

188.   Centura's improper practice of directing the Penrose-St. Francis Sleep Center sleep technologists to convert PSG tests into split-night titrations if indicated was particularly egregious given that the majority of their sleep technologists were non-credentialed and both legally and factually incompetent to score the sleep tests "on the fly," as doing so requires the interpretation of specialized instrumentation. Furthermore, one technologist generally conducted at least two sleep tests on two separate patients at a time, making it all the more difficult to correctly score sleep tests in this way.

---

[32] *Physician Fee Schedule,* CMS, https://www.cms.gov/Medicare/Medicare-Fee-for-Service-Payment/PhysicianFeeSched (last accessed 6/29/2021).
[33] *Provider Rates and Fee Schedule*, Colorado Department of Health Care Policy & Financing, https://hcpf.colorado.gov/provider-rates-fee-schedule (last accessed 6/29/2021).

189.    On information and belief, Centura knowingly falsely billed Medicare, TRICARE, and Medicaid for improperly converted PSG tests, or acted with reckless disregard or willful ignorance.

190.    On information and belief, Dr. Eid and Mr. Pekurny caused Centura to falsely bill Medicare, Tricare, and Medicaid, either through deliberate policy or failure to supervise. Dr. Eid and Mr. Pekurny acted either knowingly, or with reckless disregard or willful ignorance.

6.    **Dr. Kothari and Pediatric Sleep Specialists Failed to Physically Examine Pediatric Patients Prior to Their Sleep Test, and Inadequately Documented the Patients' Medical Necessity.**

191.    L3050 states, "The patient is to be evaluated by a physician prior to ordering of [sleep] test."[34]

192.    Further, according to the AASM's recommendations, a PSG test should be performed after a clinical evaluation, including a "thorough sleep history and a physical examination that includes the respiratory, cardiovascular, and neurologic systems."[35] Accordingly, to meet the Health First Colorado medical necessity requirement (namely, that the service is "provided in accordance with generally accepted professional standards for health care in the United States"), a PSG test must be preceded by a physical examination. 10 CCR 2505-10 8.000(8).

193.    Additionally, Medicare, TRICARE, and Health First Colorado require that documentation be maintained sufficient to prove the medical necessity of the service rendered, including a written prescription.

---

[34] [34] Local Coverage Determination L35050, effective 10/01/2015, revised 1/1/2021, available at https://www.cms.gov/medicare-coverage-database/details/lcd-details.aspx?lcdid=35050&ver=55&bc=CAAAAAAAAAAA
[35] Vipesh K. Kapur, MD, MPH *et al.*, *Clinical Practice Guideline for Diagnostic Testing for Adult Obstructive Sleep Apnea: An American Academy of Sleep Medicine Clinical Practice Guidelines*, 13 Journal of Clinical Sleep Medicine 479, 480 (2017), available at https://www.ncbi.nlm.nih.gov/pmc/articles/PMC5337595/pdf/jcsm.13.3.479.pdf.

194.   Dr. Kothari and Pediatric Sleep Specialists routinely failed to send formal prescription orders to Penrose-St. Francis Sleep Center. Rather, Dr. Kothari's assistant would send an email to the sleep technologists containing patients' initials and a one- to three-word description of the procedure ordered. For example, on March 25, 2021, the sleep technologists received the following "prescriptions:" "DH – Pap treatment; KB – post op pap treatment; KI – diagnostic." Sleep technologists would have to interpret these informal "prescriptions."

195.   On April 6, 2021, Relator called Pediatric Sleep Specialists about this practice, and requested to receive formal orders for pediatric patients she was seeing that night. Pediatric Sleep Specialists refused to produce orders to her, stating that patient histories and physicals, coupled with the informal email "prescriptions," were sufficient to authorize service.

196.   Despite Pediatric Sleep Specialist's claim that histories and physicals were all that were necessary to authorize a sleep study, Pediatric Sleep Specialist often failed to provide either or both documents for pediatric patients. When histories and physicals were provided, they were frequently boilerplate, indicating that they had not actually been filled out by Dr. Kothari or any other physician. For example, every time Relator received a patient questionnaire as part of the medical history, the questionnaire indicated that the pediatric patient experienced bed-wetting, regardless of the patients' age.

197.   Relator had multiple conversations with parents of pediatric patients in which the parent related to her the fact that the patient had never seen Dr. Kothari or any other physician in person, but had been prescribed a visit through telemedicine, without a prior physical examination of the pediatric patient.

198.   On information and belief, Dr. Kothari and Pediatric Sleep Specialists have billed Medicare, TRICARE, and Medicaid for PSG tests that were not preceded by a physical

examination, and for PSG and CPAP tests where medical necessity was not properly documented or where the documentation had been forged. Dr. Kothari and Pediatric Sleep Specialists acted knowingly, or with reckless disregard or deliberate ignorance.

### 7.   Pediatric Sleep Specialists Also Falsely Billed for Unsupervised Sleep Tests and Falsely Certified That Those Sleep Tests Were Performed by Its Employees.

199.   While Pediatric Sleep Specialists routinely rented rooms at the Penrose-St. Francis Sleep Center from Centura—often as many as three beds a night—it did not actually employ its own sleep technologists to perform sleep tests in these rooms. Rather, Centura sleep technologists, including Relator, actually performed these sleep tests.

200.   Neither Dr. Kothari nor any other physician associated with Penrose-St. Francis Sleep Center provided direction or guidance to the Centura sleep technologists during the administration of sleep tests (excepting the actual orders provided by Dr. Kothari).

201.   The majority of Dr. Kothari's pediatric patients were Medicaid recipients, with a minority receiving Medicare or TRICARE benefits. Accordingly, on information and belief, Dr. Kothari repeatedly submitted CMS Form 1500 in order to receive compensation for his services. On a CMS Form 1500 submitted for a Medicaid claim, a physician provider must certify "that the services listed above were medically indicated and necessary to the health of this patient and were personally furnished by me or my employee under my personal direction." Likewise, for Medicare and TRICARE claims, a physician provider must certify that "the services on this form were medically necessarily and personally furnished by me or were furnished incident to my professional services by my employee under my direct supervision, except as otherwise expressly permitted by Medicare or TRICARE." CMS Form 1500.

202.   These certifications were knowingly false, because the sleep tests billed by Dr. Kothari on behalf of Pediatric Sleep Specialists were performed by Centura employees, not

employees of Pediatric Sleep Specialists, and were not performed under Dr. Kothari's supervision. Dr. Kothari and Pediatric Sleep Specialists acted knowingly.

B.    **Retaliation Against Relator.**

203.    Throughout her employment at Penrose-St. Francis Sleep Center, Relator repeatedly reported the fraudulent and unlawful activities described herein to Centura management.

204.    As detailed above, in late February or early March 2021, when Ms. McAfee reported various unlawful conduct to Centura Human Resource in the wake of her termination, the sleep technologists, including Relator, were directed to avoid giving any meaningful information to Human Resource's investigation into the matter. While this direction was apparently intended to intimidate would-be whistleblowers into silence, Relator persisted in reporting unlawful conduct to Human Resources and Centura management. Relator also reported the unlawful conduct to an internal Centura whistleblowing hotline.

205.    On March 16, 2021, Gretchen Anaya Quiroga, Associate Relations Advisor at Centura Human Resources, reached out to Relator via email to investigate Ms. McAfee's claims. Relator agreed to meet with Ms. Anaya Quiroga, and they scheduled a meeting for March 23, 2021. This email exchange is attached as Exhibit 12.

206.    On March 19, 2021, Relator emailed Christopher Pekurny, the Manager of Respiratory Service at Penrose-St. Francis Hospital, reporting that "there have been nights [where] the only techs working the shift were unregistered techs. Also, in the current and upcoming schedules there are many days with only unregistered techs working." Relator informed Mr. Pekurny that she believed this was contrary to Medicare and Medicaid regulations. *See* Ex. 4.

207.    On March 22, 2021, Mr. Pekurny replied, stating he believed there was no requirement that a registered technologist be present for a sleep study, and that, even if there were

such a requirement, the fact that Athena Stroud reviewed the work of the unregistered sleep technologists would be sufficient. *Id.*

208.    On or about March 23, 2021, Relator had an in-person meeting with Ms. Anaya Quiroga, in which she reported, *inter alia*, that non-credentialed technologists were working without oversight from credentialed technologists, that certain sleep study nights were scheduled with *no* credentialed technologists, and that Dr. Kothari frequently failed to provide formal prescriptions, physicals, and histories.

209.    Relator sent several follow-up emails to Ms. Anaya Quiroga in the days following their meeting.

210.    At 9:02 AM on March 24, 2021, Relator sent Ms. Anaya Quiroga an email with the subject line "Fw: HR Meeting, Schedules." In this email, Relator attached the sleep technologist schedule, and pointed out that it included several days in which *no* credentialed technologists were scheduled.  This email is attached as Exhibit 13.

211.    At 9:04 AM on March 24, 2021, Relator sent Ms. Anaya Quiroga an email with the subject line "Fw: Local Coverage Determination for Polysomnography and Sleep Testing (L33405)."[36] In this email, Relator reiterated that Centura's policy of allowing non-credentialed technologists was not permissible under Medicare rules.  This email is attached as Exhibit 14.

212.    On March 25, 2021, Relator sent Ms. Anaya Quiroga an email with the subject line "HR continued item re Dr Kothari and office," in which she reiterated that Dr. Kothari and

---

[36] Relator mistakenly sent Ms. Anaya Quiroga the incorrect Local Coverage Determination—L33405, which governs Florida, Puerto Rico, and the Virgin Islands. However, the relevant Local Coverage Determination, L35050, is in relevant part either substantially similar to L33405, or actually stricter—in key part, L33405 allows non-credentialed technologists to work under the supervision of credentialed technologists, while L35050 simply does not permit credentialed technologists to perform Medicare-funded sleep studies.

Pediatric Sleep Specialists routinely failed to send prescription orders, and also often failed to provide histories and physicals. This email is attached as Exhibit 15.

213.    On March 27, 2021, Relator reported to Christopher Perkurny, via email, an incident involving two unregistered technologists inappropriately providing a CPAP test to a pediatric patient who had not been prescribed it. This incident is more thoroughly described *supra*. *See* Ex. 4.

214.    In response to this email, Mr. Pekurny directed Relator to meet with him and Johan Kuitse on April 8, 2021. Mr. Pekurny's email is attached as Exhibit 16. Johan Kuitse is the Director of Respiratory Therapy at Penrose-St. Francis Hospital. In Relator's understanding, Mr. Kuitse is Mr. Pekurny's superior.

215.    At the April 8, 2021 morning meeting, Relator reiterated her concerns about non-credentialed technologists administering PSG and CPAP tests, as well as her concerns about Dr. Kothari's practices.

216.    Mr. Pekurny and Mr. Kuitse told Relator that allowing non-credentialed technologists to perform sleep studies was a long-standing Centura practice, and that it would continue; They also told Relator that her concerns regarding lack of supervision of the non-credentialed technologists were unfounded, because (1) Dr. Eid, the Medical Director of Penrose-St. Francis Sleep Center, was always "a phone call away," and (2) there were always registered respiratory therapists on staff at St. Francis Hospital during the hours of operation of the Penrose-St. Francis Sleep Center.

217.    These explanations are not factually or legally sufficient to justify the illegal conduct described herein.

218.    First, as described above, Dr. Eid functioned as essentially an absentee Medical Director. Relator did not even know his name until the April 8, 2021 meeting, much less possess a number at which to reach him. Dr. Eid provided nothing resembling the direct supervision required by Health First Colorado, or the general supervision required by Medicare and TRICARE.

219.    Second, the registered respiratory therapists Mr. Pekurny and Mr. Kuitse referred also did not provide anything resembling supervision, factually or legally. The registered respiratory therapists did not work in the same building as Penrose-St. Francis Sleep Center. The sleep technologists at Penrose-St. Francis Sleep Laboratory were never instructed to contact the respiratory therapists for assistance, and, to Relator's knowledge, were never even provided a number at which to reach them.

220.    Relator remained resolute in her position that Penrose-St. Francis Sleep Center's use of non-credentialed technologists was unlawful and fraudulent. When Mr. Kuitse heard Relator use the word "fraudulent," he became agitated. Mr. Kuitse and Mr. Pekurny informed Relator that she would have to accept the way things were done at Penrose-St. Francis Sleep Center.

221.    Relator asked Mr. Kuitse and Mr. Pekurny if she was being disciplined.  Mr. Kuitse and Mr. Pekurny would not give Relator a straight answer on this question, but made it clear that her employment was contingent on her dropping the matter.

222.    Relator understood that she was being constructively terminated, as her employment was conditioned in her complicity and participation in fraud.  Because she was unwilling to be complicit, she immediately resigned.

223.    In response to her resignation, Mr. Kuitse and Mr. Pekurny informed Relator that a note would be placed in her personnel file that would prevent her from ever again being hired by a Centura hospital in any capacity.

## VII.     THE FALSE CLAIMS

### A.     Federal Health Care Program Claims Submission

224.     Providers submit claims to Medicare, TRICARE, and Medicaid and other federal health care programs for reimbursement for medical services and equipment by using CMS Form 1500.  Most claims are filed electronically.  The claim form has different numbered fields that the provider must fill in such as the patient's name, address, insured's I.D. number, referring physician's name and patient's diagnosis.

225.     The form also requires the provider to list all Current Procedural Technology ("CPT") codes for the medical services provided (field number 24D on the claim form) and the "Rendering Provider" NPI number for each CPT code (field number 24J).   CPT codes are published annually by the American Medical Association (AMA) in a CPT Manual and are composed of a five digit numeric codes (which sometimes include a numeric modifier) used to describe procedures, services and supplies.

226.     In addition, the provider must sign the form (field number 31) and attest to the certifications found on the reverse side of CMS Form 1500.  These certifications include the following relevant statements:

> **SIGNATURE OF PHYSICIAN OR SUPPLIER**
> **(MEDICARE, TRICARE, FECA AND BLACK LUNG)**
>
> In submitting this claim for payment from federal funds, I certify that (1) the information on this form is true, accurate, and complete; (2) I have familiarized myself with all applicable laws, regulations, and programs instructions, which are available from the Medicare contractor; (3) I have provided or will provide sufficient information required to allow the government to make an informed eligibility and payment decision; (4) this claim, whether submitted by me or on my behalf by my designated billing company, complies with all Medicare and/or Medicaid laws, regulations, and program instructions for payment including but not limited to the Federal anti-kickback statue and Physician Self-Referral law (commonly known as Stark law); (5) the services on this form were medically

57

necessary and personally furnished by me or were furnished incident to my professional service by my employee under my direct supervision, unless expressly permitted by Medicare or TRICARE; (6) for each service rendered incident to my professional service, the identity (legal name and NPI, license #, or SSN) of the primary individual rendering each service is reported in the designated section. For services to be considered 'incident to' a physician's professional services, (1) they must be rendered under the physician's direct supervision by his/her employee, (2) they must be an integral, although incidental part of a covered physician service, (3) they must be of kinds commonly furnished in physician's offices, and (4) the services of non-physicians must be included on the physician's bills.

…

**Medicaid Payments (Provider Certification)**

I hereby agree to keep such records as are necessary to disclose fully the extent of services provided to individuals under the State's Title XIX plan and to furnish information regarding any payments claimed for providing such services as the State Agency or Dept. of Health and Human Services may request.

…

**Signature of Physician (Or Supplier)**: I certify that the services listed above were medically indicated and necessary to the health of this patient and were personally furnished by me or my employee under my personal direction.

….

NOTICE:  This is to certify that the foregoing information is true, accurate and complete. I understand that payment and satisfaction of this claim will be from Federal and State funds, and that any false claims, statements, or documents, or concealment of a material fact, may be prosecuted under applicable Federal or State laws.

CMS Form 1500.

227.   Thus, as stated above, the form specifically contains a "medical necessity"

certification stating that the services were "medically indicated and necessary for the health of the

patient." Also, the provider must certify that all the information on the form is true, accurate and complete.

228.    Additionally, in order to participate in the Medicare Program as a provider of medical or other health services, providers must submit an enrollment application to CMS. This application includes a certification that the provider will abide by all applicable Medicare laws, regulations, and program instructions, and that payment of a claim by Medicare is conditioned upon the claim and its underlying transaction complying with such laws, regulations, and program instructions. *See* Form CMS-855A, "Medicare Enrollment Application: Institutional Providers," p.47; Form CMS-855B, "Medicare Enrollment Application: Clinics/Group Practices and other Suppliers," p.30.

229.    Additionally, an entity that wishes to participate in Colorado Medicaid program (also known as "Health First Colorado") as a provider of medical or other health services must sign an agreement which includes a certification of compliance "all federal and state civil and criminal statutes, regulations and rules relating to the delivery of benefits to eligible individuals and to the submissions of claims for such benefits." Colorado Department of Health Care Policy & Financing Provider Agreement, Form 010417a, p. 3. Additionally, the agreement specifies that the "provider shall request payment only for those services which are medically necessary or considered covered preventative services, and rendered personally by the Provider or rendered by qualified personnel under the Provider's direct and personal supervision. Provider shall submit claims only for those benefits provided by health care personnel who meet the professional qualifications established by the State." *Id.*

**B.** **Defendants Knowingly Submitted or Caused The Submission Of False Claims For Medically Unnecessary Sleep Tests.**

230.    Upon information and belief, as alleged above, Defendants knowingly caused the submission of false claims to the United States government and the State of Colorado by billing for medically unnecessary sleep tests, or for tests that otherwise violated Federal and State law, and were not in compliance with Medicare, TRICARE, or Health First Colorado regulations and Local Coverage Determinations.

231.    Billing the United States government and State of Colorado for medically unnecessary sleep tests was false and fraudulent and caused the government to overpay.

232.    Upon information and belief, the specific claims submitted by Centura to the United States government and the State of Colorado were false and fraudulent for the following reasons:

(1)    **Provider's "true, accurate, and complete" certification:** the certification on the reverse side of the CMS-1500 form that states that the information on the form are true, accurate, and complete was false and fraudulent, because (a) multiple certifications on the form were falsely attested to, and (b) the forms, in some instances, involved the use of CPT codes for procedures that no physician had prescribed;

(2)    **Provider's compliance certification**: the certifications on the reverse side of the CMS-1500 form that states that the claim complies with "all Medicare and/or Medicaid laws, regulations, and program instructions for payment"; on page 47 of the CMS-855A form that states the same; and on page 3 of Form 010417a that states that provider will comply with all "federal and state civil and criminal statutes, regulations and rules relating to the delivery of benefits to eligible individuals and to the submission of claims for such benefits"   were false and fraudulent, because, as alleged above, Centura violated numerous Medicare and Medicaid laws and regulations in relation to claims;

(3)    **Provider's medical necessity certification**: the certifications on the reverse side of the CMS-1500 form that states that the medically indicated and necessary for the health of the patient; on page 47 of the CMS-855A form that states the same; and on page 3 of Form 010417a that states the same were false and fraudulent, because, as alleged above, sleep studies were performed by non-credentialed technologists, performed without adequate physician supervision, and performed without physician prescription;

(4)    **Provider's supervision certification**: the certifications on the reverse side of the CMS-1500 form that states that the services were performed under the supervision of a physician; on page 47 of the CMS-855A form that states the same; and on page 3 of Form 010417a that states same were false and fraudulent, because, as alleged above, technologists performing sleep studies were inadequately supervised.

233.    Upon information and belief, the specific claims submitted by Pediatric Sleep Specialists to the United States government and the State of Colorado were false and fraudulent for the following reasons:

(1)    **Provider's "true, accurate, and complete" certification:** the certification on the reverse side of the form that states that the information on the CMS-1500 form are true, accurate, and complete was false and fraudulent, because multiple certifications on the form were falsely attested to;

(2)    **Provider's compliance certification**: the certifications on the reverse side of the CMS-1500 form that states that the claim complies with "all Medicare and/or Medicaid laws, regulations, and program instructions for payment"; on page 47 of the CMS-855A form that states the same; and on page 3 of Form 010417a that states that provider will comply with all "federal and state civil and criminal statutes, regulations and rules relating to the delivery of benefits to eligible individuals and to the submission of claims for such benefits"   were false and fraudulent, because, as alleged above, Pediatric Sleep Specialists violated numerous Medicare and Medicaid laws and regulations in relation to claims;

(3)    **Provider's documentation certifications**: the certifications on the reverse side of the CMS-1500 form that state that Pediatric Sleep Specialists would provide sufficient records to the United States government to allow it to make a payment determination, and that it would retain documents pursuant to Colorado's Title XIX plan were false and fraudulent, because, as alleged above, Pediatric Sleep Specialists failed to create sufficient records and/or falsified records;

(4)    **Provider's medical necessity certification**: the certifications on the reverse side of the CMS-1500 form that states that the medically indicated and necessary for the health of the patient; on page 47 of the CMS-855A form that states the same; and on page 3 of Form 010417a that states the same were false and fraudulent, because, as alleged above, sleep studies were performed without a prior physical examination; performed by non-credentialed technologists, performed without adequate physician

supervision; and performed despite not being medically indicated for pediatric patients;

(5)   **Provider's supervision certification**: the certifications on the reverse side of the CMS-1500 form that states that the services were performed under the supervision of a physician by his employees; on page 47 of the CMS-855A form that states the same; and on page 3 of Form 010417a that states the same were false and fraudulent, because, as alleged above, technologists performing sleep studies were inadequately supervised and were not Pediatric Sleep Specialists' employees.

234.   In sum, upon information and belief, Defendants submitted or caused to be submitted false and fraudulent claims during the relevant time period to Medicare, TRICARE, and Health First Colorado.  The claims to Medicare would have been submitted through the Medicare Administrative Contractor during the relevant time period, Novitas Solutions, Inc.

235.   Given the proportion of claims likely to be false, and the compensation per claim, Defendants have likely submitted millions, if not tens of millions, of dollars of false claims to the United States government and the State of Colorado.

## VIII.   <u>DAMAGES</u>

236.   While the information required to precisely determine the damages incurred by the United States of America and the State of Colorado is uniquely in the possession of Defendants, Relator has made a partial estimate of the damages, based on a number of assumptions.

237.   Relator seeks only to estimate the damages to Medicare and TRICARE with regards to sleep studies performed by non-credentialed technologists. While the remaining damages would likely be quite significant, it would be too difficult for Relator to give a meaningful estimation of these damages, given the amount of relevant information uniquely in Defendants' possession.

238.   Relator assumes for purposes of her damage estimate that March and April 2021 were representative months with regards to Penrose-St. Francis Sleep Center's scheduling of non-credentialed sleep technologists to perform sleep studies.

239.     Penrose-St. Francis Sleep Center sees six patients a night, seven days a week. It is usually staffed by three sleep technologists per night, who each see two patients. Relators assumes, for purposes of her damage estimate, that each of Centura's eight currently operating sleep laboratories sees six patients a night, seven days a week, and is staffed by three sleep technologists at any given time. Relator also assumes for purposes of her damage estimate that St. Mary-Corwin, the Centura sleep laboratory that has been defunct since, on information and belief, 2018, operated in a similar fashion.

240.     Relator assumes for purposes of her damage estimate that each of the eight currently operating Centura sleep laboratories staffs shifts with non-credentialed technologist at a similar rate as Penrose-St. Francis Sleep Center. Relator also assumes for purposes of her damage estimate that St. Mary-Corwin operated in a similar fashion.

241.     Relator conservatively assumes for purposes of her damage estimate that each sleep study conducted at any Centura location was a PSG test, compensated by Medicare and TRICARE at a rate of $652.16 per test.

242.     Relator estimates that approximately half of the patients Penrose-St. Francis Sleep Center saw were insured by Medicare or TRICARE. Relator assumes that this ratio holds true at the other Centura sleep laboratories.

243.     Based on the March and April schedules in Relator's possession (Exs. 1-2), approximately 60% of Penrose-St. Francis Sleep Center's sleep studies were performed by non-credentialed technologists.

244.     Penrose-St. Francis Sleep Center performs approximately 2190 sleep studies a year.

245.     Accordingly, approximately 1314 of these tests are performed by non-credentialed sleep technologists (2190 * .6).

246.    Approximately 657 of the tests performed by non-credentialed sleep technologists at Penrose-St. Francis Sleep Center are billed to Medicare or TRICARE per year. (1314 / 2). All of these are false claims.

247.    Penrose-St. Francis Sleep Center thus overbills Medicare and TRICARE approximately $428,469.12 per year (657 * $652.16) through the use of non-credentialed sleep technologists alone.

248.    Over the six-year limitations period, Penrose-St. Francis Sleep Center has overbilled Medicare and Tricare approximately $2.57 million ($428,469.12 * 6).

249.    Over that same period, the currently operating sleep laboratories have overbilled Medicare and TRICARE approximately $20.56 million ($2.57 million * 8).  During that same period, Centura submitted, on behalf of these sleep laboratories, approximately 31,536 false claims.

250.    Additionally, between 2015 and its closure in 2018, St. Mary Corwin would have overbilled Medicare and TRICARE approximately $1.28 million ($428,469.12 * 3). During that same period, Centura submitted, on behalf of St. Mary-Corwin, approximately 1,971 false claims (657 *3).

251.    Accordingly, over the limitations period, Defendants have overbilled Medicare and TRICARE by approximately $21.84 million based solely on their use of non-credentialed sleep technologists ($20.56 million + $1.28 million). Over the limitations period, Defendants have submitted approximately 33,507 false claims (31,536 + 1,971). The majority of these claims would have been submitted by Centura; a small portion would have been submitted by Pediatric Sleep Specialists.

252.    Trebled, these damages would be $65.52 million.

253.    Assuming the award of the minimum of $11,665 per claim in statutory damages, statutory damages would be approximately $390.86 million ($11,665 * 33,507).

254.    In total, Relator's estimates of the damages solely related to the employment of non-credentialed technologists would be $456.38 million. This figure is consistent with the high rate of fraud the HHS Office of Inspector General found throughout the sleep testing industry in its June 2019 Report *Medicare Payments to Providers for Polysomnography Services Did Not Always Meet Medicare Billing Requirements*.[37]

## IX.    COUNTS

### Count I
### Federal False Claims Act
### 31 U.S.C. §§3729(a)(1)(A), and (a)(1)(B)
### Against Centura, Dr. Eid, and Mr. Pekurny
### For Medically Unnecessary Sleep Tests

255.    Relator alleges and incorporates by reference all of the preceding paragraphs of this Complaint as if fully set forth herein.

256.    Relator seeks relief against Defendants under the False Claims Act, 31 U.S.C. §3729(a)(1)(A) and (a)(1)(B).

257.    Through the acts described above, Defendants knowingly presented or caused to be presented false or fraudulent claims to the United States Government for payment or approval.

258.    Through the acts described above, Defendants knowingly made, used, or caused to be made or used false or fraudulent records and statements, material to a false or fraudulent claim to the United States for payment or approval.

---

[37] Joanne M. Chiedi (Acting Inspector General), *Medicare Payments to Providers for Polysomnography Services Did Not Always Meet Medicare Billing Requirements,* A-04-17-07069, Department of Health and Human Services Office of the Inspector General (June 2019), available at https://oig.hhs.gov/oas/reports/region4/41707069.asp.

259.     The United States Government and its officers, employees and agents, unaware of the falsity of the records, statements, and claims made or caused to be made by the Defendants paid and continues to pay claims that would not be paid but for the Defendants' illegal and fraudulent practices.

260.     By reason of the acts of Defendants, the United States has been damaged, and continues to be damaged, and therefore is entitled to multiple treble damages under the False Claims Act in an amount to be determined at trial, plus a civil per claim penalty in the maximum amount permitted by law for each violation.

<u>**Count II**</u>
**Federal False Claims Act**
**31 U.S.C. §§3729(a)(1)(A), and (a)(1)(B)**
**Against Pediatric Sleep Specialists and Dr. Kothari**
**For Medically Unnecessary Sleep Tests**

261.     Relator alleges and incorporates by reference all of the preceding paragraphs of this Complaint as if fully set forth herein.

262.     Relator seeks relief against Defendants under the False Claims Act, 31 U.S.C. §3729(a)(1)(A) and (a)(1)(B).

263.     Through the acts described above, Defendants knowingly presented or caused to be presented, false or fraudulent claims to the United States Government for payment or approval.

264.     Through the acts described above, Defendants knowingly made, used, or caused to be made or used false or fraudulent records and statements, material to a false or fraudulent claim to the United States for payment or approval.

265.     The United States Government and its officers, employees and agents, unaware of the falsity of the records, statements, and claims made or caused to be made by the Defendants

paid and continues to pay claims that would not be paid but for the Defendants' illegal and fraudulent practices.

266.     By reason of the acts of Defendants, the United States has been damaged, and continues to be damaged, and therefore is entitled to multiple treble damages under the False Claims Act in an amount to be determined at trial, plus a civil per claim penalty in the maximum amount permitted by law for each violation.

<div align="center">

**Count III**
**Federal False Claims Act**
**31 U.S.C. §§3729(a)(1)(C)**
**Against All Defendants for Conspiracy**

</div>

267.     Relator alleges and incorporates by reference all of the preceding paragraphs of this Complaint as if fully set forth herein.

268.     Relator seeks relief against all Defendants under the False Claims Act, 31 U.S.C. §3729(a)(1)(C).

269.     Through the acts described above, Defendants conspired together and acted in concert to allow Pediatric Sleep Specialists to knowingly present or cause to be presented, false or fraudulent claims to the United States for payment or approval.

270.     The United States Government and its officers, employees and agents, unaware of the falsity of the records, statements, and claims made or caused to be made by the Defendants, paid and continues to pay claims that would not be paid but for the Defendants' illegal and fraudulent practices.

271.     By reason of the acts of Defendants, the United States has been damaged, and continues to be damaged, and therefore is entitled to multiple treble damages under the False Claims Act in an amount to be determined at trial, plus a civil per claim penalty in the maximum amount permitted by law for each violation.

**Count IV**
**Federal False Claims Act**
**31 U.S.C. §§3730(h)**
**Against Centura, Dr. Eid, and Mr. Pekurny**
**For Retaliation**

272.    Relator engaged in lawful acts done in furtherance of the goal of preventing violations of the Federal False Claims Act, namely (1) reporting said violations and (2) refusing to participate in them.

273.    Centura harassed and discriminated against Relator for her lawful protected activity, by conditioning her continued employment on (1) ceasing to report False Claims Act violations, and (2) participating in those violations. Because of this harassment and discrimination, Relator was forced to leave her employment.

274.    By reason of the acts of Defendants, Relator was damaged through the loss of income, and is therefore entitled to double back-pay with interest under the the False Claims Act in an amount to be determined at trial, plus litigation costs and reasonable attorney's fees.

**Count V**
**Colorado Medicaid False Claims Act**
**Colo Rev. Stat. § 25.5-4-305(1)(a) and 25.5-4-305(1)(b)**
**Against Centura, Dr. Eid, and Mr. Pekurny**
**For Medically Unnecessary Sleep Tests**

275.    Relator alleges and incorporates by reference all of the preceding paragraphs of this Complaint as if fully set forth herein.

276.    Relator seeks relief against Defendants under the Colorado Medicaid False Claims Act, Colo. Rev. Stat. § 25-4-303.5 *et seq.*

277.    Through the acts described above, Defendants knowingly presented or caused to be presented, false or fraudulent Medicaid claims to Colorado for payment or approval.

278.    Through the acts described above, Defendant knowingly made, used, or caused to be made or used false records and statements, to get false or fraudulent Medicaid claims allowed or paid by Colorado.

279.    As a result, Colorado monies were lost through the payment of such false and fraudulent claims.

280.    The State of Colorado has been damaged, and continues to be damaged, in an amount to be determined at trial, because of the acts of Defendants.

**<u>Count VI</u>**
**Colorado Medicaid False Claims Act**
**Colo Rev. Stat. § 25.5-4-305(1)(a) and 25.5-4-305(1)(b)**
**Against Pediatric Sleep Specialists and Dr. Kothari**
**For Medically Unnecessary Sleep Tests**

281.    Relator alleges and incorporates by reference all of the preceding paragraphs of this Complaint as if fully set forth herein.

282.    Relator seeks relief against Defendants under the Colorado Medicaid False Claims Act, Colo. Rev. Stat. § 25-4-303.5 *et seq.*

283.    Through the acts described above, Defendants knowingly presented or caused to be presented, false or fraudulent Medicaid claims to Colorado for payment or approval.

284.    Through the acts described above, Defendant knowingly made, used, or caused to be made or used false records and statements, to get false or fraudulent Medicaid claims allowed or paid by Colorado.

285.    As a result, Colorado monies were lost through the payment of such false and fraudulent claims.

286.    The State of Colorado has been damaged, and continues to be damaged, in an amount to be determined at trial, because of the acts of Defendants.

## Count VII
**Colorado Medicaid False Claims Act**
**Colo Rev. Stat. § 25.5-4-305(1)(c)**
**Against All Defendants**
**For Medically Unnecessary Sleep Tests**

287.    Relator alleges and incorporates by reference all of the preceding paragraphs of this Complaint as if fully set forth herein.

288.    Relator seeks relief against Defendants under the Colorado Medicaid False Claims Act, Colo. Rev. Stat. § 25-4-303.5 *et seq.*

289.    Through the acts described above, Defendants conspired together and acted in concert to allow Pediatric Sleep Specialists to knowingly present or cause to be presented, false or fraudulent claims to the State of Colorado for payment or approval.

290.    Through the acts described above, Defendant knowingly made, used, or caused to be made or used false records and statements, to get false or fraudulent Medicaid claims allowed or paid by Colorado.

291.    As a result, Colorado monies were lost through the payment of such false and fraudulent claims.

292.    The State of Colorado has been damaged, and continues to be damaged, in an amount to be determined at trial, because of the acts of Defendants.

## Count VII
**Colorado Medicaid False Claims Act**
**Colo Rev. Stat.  § 25.5-4-306(7)**
**Against Centura, Mr. Pekurny, and Dr. Eid**
**For Retaliation**

293.    Relator engaged in lawful acts done in furtherance of the goal of preventing violations of the Colorado Medicaid False Claims Act, namely (1) reporting said violations and (2) refusing to participate in them.

294.    Centura harassed and discriminated against Relator for her lawful protected activity, by conditioning her continued employment on (1) ceasing to report Colorado Medicaid False Claims Act violations, and (2) participating in those violations. Because of this harassment and discrimination, Relator was forced to leave her employment.

295.    By reason of the acts of Defendants, Relator was damaged through the loss of income, and is therefore entitled to double back-pay with interest under the Colorado Medicaid False Claims Act in an amount to be determined at trial, plus litigation costs and reasonable attorney's fees.

## **PRAYER**

**WHEREFORE,** Relator prays for judgment against the Defendants as follows:

296.    That Defendants cease and desist from violating *31 U.S.C. §3729, et seq.,* and *Colo. Rev. Stat.. §25.5-4-303.5 et seq.*;

297.    That this Court enter judgment against Defendants in an amount equal to three times the amount of damages the United States has sustained because of Defendants' actions, plus a civil penalty of not less than $11,665 and not more than $23,331 for each violation of 31 U.S.C. §3729*, et seq;*

298.    That this Court enter judgment against Defendants in amount equal to three times the amount of damages the State of Colorado has sustained because of Defendants' actions, plus a civil penalty of not less than $5,500 and not more than $11,000 for each violation of Colo. Rev. Stat.. §25.5-4-303.5 et seq..

299.    That Relator be awarded the maximum amount allowed pursuant to §3730(d) of the Federal False Claims Act, and §25.5-4-306(4) of the Colorado Medicaid False Claims Act;

300.    That Relator be awarded double backpay with interest under §3730(h) of the Federal False Claims Act, and §25.5-4-306(4) of the Colorado Medicaid False Claims Act;

301.    That Relator be awarded all costs of this action, including reasonable attorneys' fees and expenses; and

302.    That Relator recover such other relief as the Court deems just and proper.

<u>**DEMAND FOR JURY TRIAL**</u>

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Relator hereby demands a trial by jury.

Dated:  October, 4, 2021

*Sherrie R. Savett*

**BERGER MONTAGUE, P.C.**
Sherrie R. Savett,
William H. Fedullo,
1818 Market Street, Suite 3600
Philadelphia, PA  19103-6305
Telephone: (215) 875-3071
Facsimile: (215) 875-5715